Stefanik v Hochul (2024 NY Slip Op 04236)

Stefanik v Hochul

2024 NY Slip Op 04236 [43 NY3d 49]

August 20, 2024

Wilson, Ch. J., J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, April 16, 2025

[*1]

Elise Stefanik et al., Appellants,
v
Kathy Hochul, as Governor of the State of New York, et al., Respondents, and DCCC et al., Intervenors-Respondents.

Argued July 30, 2024; decided August 20, 2024

Stefanik v Hochul, 229 AD3d 79, affirmed.

{**43 NY3d at 53} OPINION OF THE COURT

Chief Judge Wilson.

{**43 NY3d at 54}Plaintiffs, a coalition of elected officials, registered voters, and party officials, challenge New York's Early Mail Voter Act (the Act), which permits all registered voters to vote early by mail in any election in which the voter is eligible to vote. Plaintiffs maintain the Act is unconstitutional and seek a declaratory judgment and a permanent injunction against its implementation and enforcement. The question raised here is difficult. Though the State Constitution contains no language that explicitly requires in-person voting, the legislative and executive branches have often proceeded as if our Constitution requires as such. Our Court has never been asked to determine what the Constitution requires in this regard. Recently, the legislature assumed that the Constitution requires in-person voting, passing concurrent resolutions culminating in the 2021 proposed amendment to authorize mail-in voting. We acknowledge that the public rejected that amendment, and we take seriously both the legislature's position in 2021 and the voters' rejection of the proposed constitutional amendment. At the same time, we may not simply defer to the legislature's assumptions about what the Constitution requires. Our task is to rigorously analyze the constitutional text and history to determine if New York's Early Mail Voter Act is unconstitutional. We now hold that it is not.
I.
On September 20, 2023, the Act was signed into law, permitting any registered voter to apply to vote early by mail (L 2023, ch 481, codified as Election Law § 8-700 et seq.). The law became effective on January 1, 2024. Among other things, the Act authorizes all registered voters in New York to apply to "vote early by mail . . . in any election . . . in which the voter is eligible to vote" (Election Law § 8-700 [1]). The Act provides that early voting application forms may be filed either with the Board of Elections through the "electronic early mail ballot application transmittal system or in person with the board of inspectors" (id. § 8-700 [2] [b]), or through the mail (see id. § 8-700 [2] [d]), and that the applicant must certify "as the equivalent of an affidavit" their name, date of birth, address, and that they are a registered voter in the county where they are applying to vote (id. § 8-700 [3] [a], [b]; [6]).[FN1]

The Act came on the heels of a failed constitutional amendment to allow universal absentee voting. The proposed amendment{**43 NY3d at 55} was passed by the legislature in 2019 and 2021, with the explanation that voting by mail required a constitutional amendment because "the New York Constitution only allows absentee voting if a person expects to be absent from the county in which they live . . . or because of illness [or] physical disability" (Senate Introducer's Mem in Support of 2019 NY Senate-Assembly Concurrent Resolution S1049, A778). Similarly, the ballot summary explained that the purpose of the amendment was to "eliminate the requirement that a voter provide a reason for voting by absentee ballot" (Ballot Proposal 4, 2021 Statewide Ballot Proposal: Abstract).[FN2] Voters rejected the proposed amendment in November 2021.
In 2023, the legislature passed the Act, stating that "early voting by mail" is different from the failed provision regarding "absentee voting" and falls within the legislature's general power to regulating the manner of voting (Letter from NY St Bd of Elections, Aug. 23, 2023, Bill Jacket, L 2023, ch 481 at 15-16; NY Assembly Debate on 2023 NY Assembly Bill A7632A, June 9, 2023 at 343, 378, 380, 394). The same day the Act was signed into law, plaintiffs commenced this action against the Governor, the State Board of Elections, the Board's co-chairs, and the State of New York seeking a declaratory judgment that the law violated the New York Constitution and an injunction against its enforcement.[FN3]
More specifically, plaintiffs maintained that the Act violated article II, § 2 of the New York Constitution, which reads:
"The legislature may, by general law, provide a manner in which, and the time and place at which, qualified voters who, on the occurrence of any election, may be absent from the county of their residence or, if residents of the city of New York, from the city, and qualified voters who, on the occurrence{**43 NY3d at 56} of any election, may be unable to appear personally at the polling place because of illness or physical disability, may vote and for the return and canvass of their votes" (NY Const, art II, § 2).
[*2]
Although this text may not read conclusively to bar mail-in voting, plaintiffs emphasized that the Constitution has been historically understood as mandating in-person voting and that just a few years ago, the legislature acknowledged that a constitutional amendment would be required to institute universal mail-in voting. Plaintiffs also pointed out that the executive branch has, in other litigation, characterized the Constitution as requiring in-person voting.
Intervenor-defendants filed a proposed motion to dismiss the complaint. They argued that the Act did not conflict with article II, § 2; that the Act fell within the legislature's broad powers under section 7; and that nothing else in the State Constitution rendered the Act unconstitutional. Defendants Kathy Hochul and the State of New York filed a separate motion to dismiss making similar arguments. Plaintiffs opposed defendants' motions to dismiss and cross-moved for summary judgment.
Supreme Court declared the Act constitutional, granted defendants' motions to dismiss, denied plaintiffs' cross-motion for summary judgment, and dismissed the complaint (82 Misc 3d 1126 [Sup Ct, Albany County 2024]). The court agreed with defendants that given the plenary power of the state legislature, absent any "express or necessarily implied prohibition" in the Constitution, the legislature should be understood to have the power to regulate the manner of voting (id. at 1131). The court reasoned that because the Constitution did, at one point, have language requiring in-person voting that has since been removed, the removal of such language, coupled with the fact that article II, § 2 has no express language prohibiting mail-in voting, "evinces the intent that in-person voting no longer be required" (id. at 1133). Accordingly, the court held that plaintiffs had failed to meet their burden of demonstrating the Act's unconstitutionality (id.).
Plaintiffs appealed, and the Appellate Division unanimously affirmed (229 AD3d 79 [3d Dept 2024]). The Court highlighted the text of the Constitution, which grants the legislature explicit power to regulate elections (229 AD3d at 89, citing NY Const, art II, § 7 [elections shall take place "by ballot, or by such other method as may be prescribed by law, provided that{**43 NY3d at 57} secrecy in voting be preserved"]) and notably does not prohibit mail-in voting (229 AD3d at 84, 87-88). The Court also highlighted the history of article II, § 2, noting that between 1846 and 1966, the Constitution contained a [*3]provision that voters must vote "in the election district of which he shall at the time be a resident, and not elsewhere" (229 AD3d at 85-86, citing 1846 NY Const, art II, § 1 [hereinafter the Election District Provision]). The Court emphasized that it was against this backdrop a variety of constitutional amendments were adopted that created exceptions to that rule for soldiers, ill persons, and eventually absentees, and that the current article II, § 2, adopted in 1963, was one such amendment (229 AD3d at 85-86).
At the same time, the Court noted that in 1966, an amendment significantly streamlined article II, § 1, which, among other things, deleted the Election District Provision (229 AD3d at 86-87). The Court reasoned that this deletion removed the constitutional requirement for in-person voting, looking also to the three statutes expanding absentee voting to additional groups the legislature since passed as support (229 AD3d at 88, citing Election Law §§ 11-302, 11-306, 11-308). The Court found the historical record to be decisive of the fact that since 1966 there has not been a constitutional in-person voting requirement, despite acknowledging that its reading might make article II, § 2 largely superfluous (229 AD3d at 90-91).
Plaintiffs appealed as of right (see CPLR 5601 [b] [1]). We now affirm.
II.
It is a "well settled [rule] that [l]egislative enactments are entitled to a strong presumption of constitutionality, and courts strike them down only as a last unavoidable result after every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (White v Cuomo, 38 NY3d 209, 216 [2022] [internal quotation marks and citations omitted]). Moreover,
"[a]n arrangement made by law for enabling the citizen to vote should not be invalidated by the courts unless the arguments against it are so clear and conclusive as to be unanswerable. Every presumption is in favor of the validity of such a law, and it is only when the courts are compelled{**43 NY3d at 58} by force of reason and argument that they will declare such a law invalid" (People ex rel. Lardner v Carson, 155 NY 491, 501 [1898]).
[*4]
Nonetheless, it is "the responsibility of the courts" to define the rights and prohibitions set forth in the State Constitution, "which constrain the activities of all three branches" of the government (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 39 [1982]).
The legislature's power to enact laws is plenary—limited only by the Federal and State Constitutions (see Matter of McAneny v Board of Estimate & Apportionment of City of N.Y., 232 NY 377, 389 [1922]; Lawton v Steele, 119 NY 226, 232-233 [1890], affd 152 US 133 [1894]). This includes "plenary power over the whole subject of elections" (People ex rel. Lardner, 155 NY at 502; see Matter of Burr v Voorhis, 229 NY 382, 388 [1920]). Accordingly, rather than enumerating the legislature's permitted functions, the State Constitution generally operates to limit this plenary authority by imposing restrictions on the legislature's exercise of its powers (Peter J. Galie & Christopher Bopst, The New York State Constitution at 112 [2d ed 2012]). The question in determining the constitutionality of a legislative action is therefore not whether the State Constitution permits the act, but whether it prohibits it. "Obedience must be rendered to statutes which do not offend against such restrictions, even though they may seem to us impolitic" (Village of Kenmore v County of Erie, 252 NY 437, 441 [1930]).
Although plaintiffs contend Matter of Kuhn v Curran should guide our constitutional construction (see 294 NY 207, 217 [1945]), we have since disavowed its approach (see Golden v Koch, 49 NY2d 690, 694 [1980]; see also Matter of Carey v Morton, 297 NY 361, 366 [1948]). Thus, to resolve the legality of the Act, we must start with the text of the Constitution (see Matter of Harkenrider v Hochul, 38 NY3d 494, 509 [2022]).
III.
The question that confronts us is whether the Constitution prevents the legislature from enacting universal, no-excuse, mail-in voting in a manner that overcomes the strong presumption of constitutionality we must afford the Act. Initially, nothing in the Constitution's text clearly establishes an in-person voting requirement. Before 1966, the legislature and executive branch—citing the Election District Provision—often believed that the Constitution required in-person voting and acted accordingly.{**43 NY3d at 59} Although the status of the Election District Provision as a source of any in-person voting requirement is less than certain, in 1966, the provision was removed through a constitutional amendment. Since then, the legislature and executive branch have more often acted as if no constitutional amendment was necessary to allow certain groups to vote without being present at the polls.
Thus, to adopt plaintiffs' position, we would either have to conclude that the pre-1966 Constitution contained an in-person voting requirement separate from the Election District Provision, or that the Election District Provision embodied an in-person voting requirement and that the removal of that requirement was somehow inadvertent or accidental in a way that rendered it ineffective. Neither the parties' arguments supporting those propositions, nor the legislative history are sufficient to overcome the very strong presumption of constitutionality.
[*5]A.
Plaintiffs first argue that New York's original Constitution, in 1777, textually mandated in-person voting via article II, § 1. The provision states in relevant part that "[e]very citizen shall be entitled to vote at every election" (NY Const, art II, § 1 [emphasis added]), and plaintiffs argue that the preposition "at" refers to, and mandates, voting in person. To start, plaintiffs contend that because the 1777 Constitution replaced viva voce voting (voting by voice) with ballot voting, the Constitution must require in-person voting. That does not follow. First, if, whether by custom or practical necessity, people in 1777 voted by voice, the fact that they did so is not evidence of a constitutional requirement. Moreover, because the 1777 Constitution replaced viva voce voting with ballot voting, one could instead conclude that the 1777 Constitution abandoned a requirement that voting must be in person, because (unlike voice voting) ballots do not necessarily have to be cast in person.
Turning to the constitutional language, both in 1777 and today, article II, § 1 guarantees the right to vote to every person who satisfies the then-applicable eligibility requirements. It does not place a limitation on the physical location of voting. Plaintiffs' textual argument based on the word "at" is meritless, and no member of this Court accepts it. The word "at" may be used to denote both the location and time of some{**43 NY3d at 60} specific event (see Cambridge Online English Dictionary, at [https://dictionary.cambridge.org/us/dictionary/english/at]). Indeed, "voting at an election" is a long-standing and very common idiom having nothing to do with any restriction on place; it carries the same meaning as "in."[FN4] The constitutional provision, by its plain reading, guarantees eligible persons the right to vote at elections and says nothing about where or when the voting must take place. Thus, "at every election" communicates the same meaning as "in every election." Accordingly, the 1777 constitutional provision "at an election" cannot reasonably be interpreted to require in-person voting.
B.
The 1821 New York Constitution provided that every male citizen over the age of 21 years, who met certain other qualifications, "shall be entitled to vote in the town or ward where he actually resides, and not elsewhere" (1821 NY Const, art II, § 1). That language was reenacted in 1846 as:
"Every male citizen of the age of twenty-one years, who shall have been a citizen for ten days, and an inhabitant of this state one year next preceding any election, and for the last four months a resident of the county where he may offer his vote, shall be entitled to vote at such election in the election district of which he shall at the time be a resident, and not elsewhere, for all officers that are now{**43 NY3d at 61} or hereafter may be elective by the people" (1846 NY Const, art II, § 1 [emphasis added]).
Voting "in the election district" where one resides does not necessarily require that the vote be in person. The purpose of the provision, as reflected in the legislative history, shows that it was intended as an anti-fraud measure, designed to prevent people from swaying an election by traveling to vote for candidates who were not their own [*6]representatives. The debate about this provision centered on the concern that people would be "imported" to swing elections just before they occurred, and mostly addressed how long a person should need to be a resident somewhere before being eligible to vote for candidates properly on the ballot in that place (see e.g. L.H. Clarke, A Report of the Debates and Proceedings of the Convention of the State of New-York, Held at the Capitol, in the City of Albany, on the 28th Day of August, 1821 at 111-112 [1821] [hereinafter 1821 Convention Proceedings]; William G. Bishop & William H. Attree, Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of New-York at 1036-1037, 1042-1044 [1846]; see also People ex rel. Lardner, 155 NY at 500 ["The purpose of the restriction was to prevent fraud and repeating"]).[FN5] The debates do not contain any mention of an in-person voting requirement or the possibility of voting by mail or some other method, likely because before the Civil War, voting was universally conducted at polling places.
The Civil War brought with it an exigency: how could Union soldiers stationed away from home vote, given the large numbers of otherwise eligible soldiers who were not present in their districts during elections (2 Charles Z. Lincoln, The Constitutional History of New York at 235 [1906]). The legislature's initial view was that it could pass a statute permitting Union soldiers to vote remotely—that no constitutional amendment was required for it to do so. Thus, in 1863, the legislature passed a bill allowing soldiers to vote if they were not present in their election districts (id. at 235-236).{**43 NY3d at 62} However, Governor Seymour, who opposed allowing soldiers to vote,[FN6] vetoed the legislation (id. at 237-238). In explaining his veto, he seized on the Election District Provision as the source of a constitutional requirement that voting must be conducted in person (id. at 236-239).
Notably, however, contemporaneous judicial decisions in other states suggest that Governor Seymour's interpretation was highly uncertain. Several states with similar constitutions did not interpret them to mandate in-person voting (see Morrison v Springer, 15 Iowa 304 [1863]; Lehman v McBride, 15 Ohio St 573, 576 [1863] [the Constitution speaks to the place of residence, not the location of voting]; State ex rel. Chandler v Main, 16 Wis 398, 398 [1863] ["no person shall vote for county officers out of the county in which he resides" prohibits voting for officers of the wrong county, not voting out of state for the correct county]). On the other hand, some states held that [*7]their constitutions mandated in-person voting (see People ex rel. Twitchell v Blodgett, 13 Mich 127, 142-145 [1865] ["offers to vote" in a particular township "by ballot" contemplates personal presence of the elector]; Bourland v Hildreth, 26 Cal 161, 186, 195-197 [1864] ["claims his vote" in a particular county and the word "vote" itself requires personal presence]; {**43 NY3d at 63}Chase v Miller, 41 Pa 403, 419 [1862]).[FN7] The principal points drawn from this history are that no result was then thought as indisputably correct, and no judicial resolution of the issue occurred in New York.
Although more than two thirds of the Senators and a majority of the Assembly members voted to override Governor Seymour's veto (thereby indicating their belief that the Constitution did not prevent absentee voting, although unable to obtain the two thirds in the Assembly necessary to override the Governor), the legislature took the only remaining available route, proposing an amendment to the Constitution (see 2 Lincoln, The Constitutional History of New York at 239). The amendment was approved by the people (by a more than 5 to 1 margin) at a special election in March of 1864, granting the legislature "power to provide the manner in which, and the time and place at which, such absent electors may vote, and for the canvass and return of their votes in the election districts in which they respectively reside, or otherwise" so that "in time of war no elector in the actual military service of the United States, in the Army or Navy thereof, shall be deprived of his vote by reason of his absence from the state" (id. at 239, quoting 1846 NY Const, art II, § 1, as amended Mar. 8, 1864). The legislature then passed a bill enabling soldiers to vote absentee, similar to the one vetoed in 1863, and the Governor signed it (id.). The Court of Appeals was never asked to determine whether the Election District Provision, in fact, represented an in-person voting requirement.
The closest we came to considering the scope of the Election District Provision was in People ex rel. Lardner v Carson (155 NY at 497), decided shortly after the Civil War. There, we held that "the whole subject of creating election districts and locating{**43 NY3d at 64} the polling places where the residents of the district may vote, is with the legislature, and it may lawfully delegate this power to local authorities" (id.). In Lardner, the relator argued that the Election District Provision's requirement "that the elector must vote 'in the election district of which he shall at the time be a resident and not elsewhere' "—the same language referenced in this case—invalidated certain votes that were cast at a polling place located outside of the election district, though designated as the location for those voters to cast their votes (id. at 495-496). We rejected the relator's argument on the ground that "an election district is just what the legislature chooses to make it. In this respect it is supreme" (id. at 496). Lardner emphasizes the legislature's broad discretion over the methods of conducting elections, as expressed in the amendment adopted a few years earlier.
As our colleagues point out, Lardner also contains language stating that "[n]o vote can be registered, cast or counted in this state except at the polling place of some election district" (id. at 498); "[a]ll that the Constitution requires is that the elector must vote at the polling place designated by law for casting the vote of the district where he resides" (id. at 500); and the Constitution "is fully complied with when [a voter] votes with his neighbors at the place designated by law for that purpose" (id. at 503). But whether the legislature could authorize ballots to be mailed to a polling place was not even remotely an issue in that case, rendering those statements wholly unnecessary to our holding. Moreover, our holding—that "the whole subject of creating election districts and locating the polling places where the residents of the district may vote, is with the legislature" (155 NY at 497)—supports the proposition that the legislature's express constitutional power over the method of conducting elections would extend to allowing ballots to be delivered to polling places by mail (or any other method, so long as secrecy was preserved). Thus, [*8]contrary to the way in which our colleagues read Lardner (as holding that the Constitution in 1898 required in-person voting), that case reemphasizes the broad power of the legislature to determine the method of elections.[FN8] To the extent Lardner could be interpreted in two different{**43 NY3d at 65} ways, that merely adds to the uncertainty as to whether the Constitution requires that voting must be in person.
Nevertheless, for nearly a century thereafter, when the legislature extended voting to groups of voters who were not present in their election district on Election Day, it did so by proposing a constitutional amendment, to be acted on by popular referendum. In 1919, the voters approved an amendment to allow absentee voting for people unavoidably absent due to their occupation or business (1894 NY Const, art II, § 1-a, as added Nov. 4, 1919). In 1923, the voters authorized an amendment to the Constitution to allow absentee voting by residents of soldiers' homes and again in 1929 to allow patients in veterans' hospitals to vote by absentee ballot. The voters approved additional amendments in 1947 to permit absentee voting by those unavoidably absent due to business of a family member (NY Const, art II, § 2, as amended Nov. 4, 1947), in 1955 to allow absentee voting by those unable to appear because of illness or physical disability (NY Const, art II, § 2, as amended Nov. 8, 1955), and in 1963 to allow absentee voting by persons absent from their place of residence for any reason (NY Const, art II, § 2, as amended Nov. 6, 1963). A fair interpretation is that, from 1919 to 1963, the legislature believed that the Constitution forbade absentee voting, which therefore could be accomplished only by a constitutional amendment.
C.
Plaintiffs and defendants both identify the Election District Provision as the source of the constitutional requirement that all voting be conducted in person. That provision, however, was removed by a constitutional amendment in 1966, so it can no longer serve as a textual basis constraining the legislature's power to permit voting by mail.[FN9] Indeed, shortly after the deletion of the Election District Provision, the 1967 Temporary{**43 NY3d at 66} Commission on the Constitutional Convention observed that the deletion of that provision may have had the effect of allowing remote voting (see 1967 Rep of Temp St Commn on Constitutional Convention, Rep No. 4, The Right to Vote at 51 n 28 [explaining that the removal of the Election District Provision in 1966 might be interpreted to "bar the Legislature from prescribing absentee voting in cases not within the scope of" section 2's absentee ballot provision, but might alternatively be interpreted "to give the Legislature unrestricted discretion over absentee voting"]).
For several decades thereafter, the legislature extended absentee voting to several new groups by statute, without any suggestion that a constitutional amendment was needed.{**43 NY3d at 67} The legislative history of those provisions does not shed light on the question of why the legislature concluded no constitutional amendment was required. In 1982, the election worker ballot was enacted (Election Law § 11-302, as added by L 1982, ch 178). Although in the legislative materials, the Board of Elections stated that this special ballot "must be cast in person" and is "not an absentee ballot" (St Bd of Elections Mem in Support, Bill Jacket, L 1982, ch 178), the Board of Elections and courts have [*9]subsequently interpreted it to allow mail-in voting (see Matter of Panio v Sunderland, 14 AD3d 627, 631 [2d Dept 2005] ["It is undisputed that the Board (of Elections) has never printed or provided a special ballot application or a special ballot for poll workers. Instead, the Board has historically instructed poll workers to apply for, and vote by, absentee ballots"]).
The legislature passed similar laws to allow victims of domestic violence, caretakers, and emergency responders to vote by mail. In 1996, the legislature permitted victims of domestic violence to vote by "special ballot" without regard to whether they were present in their election district on Election Day (Election Law § 11-306, as added by L 1996, ch 702). As with election workers, the original legislation says the ballots must be "delivered," but the provision was specifically amended in 2019 to allow domestic violence victims to deliver their votes by mail (L 2019, ch 150)—again, without any suggestion that a constitutional amendment was needed.
Next, in 2009, the legislature unanimously amended the absentee voting statute to allow all persons to vote by absentee ballot if they have "duties related to the primary care of one or more individuals who are ill or physically disabled" (Election Law § 8-400 [1] [b]; [3] [c] [ii]; L 2009, ch 426). Finally, in 2016, the legislature enacted a statute to allow emergency responders to vote by mail (Election Law § 11-308; L 2016, ch 485). The text states that the ballots may be "delivered" to any office of any Board of Elections (without specification of by whom or how), and the State Board of Elections has interpreted the word "delivered" to mean ballots can be returned either in person or by mail (see New York State Board of Elections, New York State Special Ballot Application for Emergency Responders, https://www.vote.nyc/sites/default/files/pdf/Absentee_voting/SpecialBallotAppEmergencyResponders.pdf [last accessed Aug. 20, 2024]). Interestingly, the statute provides that even ballots delivered to the wrong location are validly cast and acceptable (see Election Law § 11-308 [5] ["special ballots received by boards of elections from voters under the jurisdiction of another board of elections shall be date and time-stamped and immediately forwarded to the voter's board of elections"]).
Contrary to the dissent's view (see dissenting op at 109-111), article II, § 2 cannot be the legislature's source of authority to permit election workers, first responders, victims of domestic violence, or caretakers of ill or physically disabled persons to vote by some means other than in-person at the polls. For example, the Election Law requires only that victims of domestic violence have "left" their "residence because of" the domestic violence (Election Law § 11-306 [1] [b]). The statute permits absentee voting for all such victims who "wish[ ] to cast a special ballot" because "of the threat of physical or emotional harm to himself or herself or to family or household members" (Election Law § 11-306 [1] [c]). The dissent's assertion that this provision is "consistent with" article II, § 2 because it "hinges on the voter's attestation that they will be absent from their registered residence" (dissenting op at 
110) is incorrect, because that does not amount to a requirement that the voter be "absent from the county of their residence" (NY Const, art II, § 2). Likewise, caretakers of ill or physically disabled persons must attest that they are "unable to appear personally at the polling place . . . because of . . . duties related to" care of such persons (Election Law § 8-400 [1] [b]), but article II, § 2 {**43 NY3d at 68}requires that a qualifying inability to appear must be "because of illness or disability"—not because of duties related to someone else's illness or disability.
Plaintiffs challenge the post-1966 statutory exceptions to in-person voting as untested by the courts and therefore not very meaningful. But the same can be said for the various constitutional amendments adopted between 1864 and 1963—this Court was never asked to determine whether our Constitution required votes to be cast in person at a polling place on Election Day. In both circumstances, the legislative and executive branches proceeded under judicially untested assumptions that were both largely unexamined by the legislature and which differed markedly at different points in time.
D.
Plaintiffs advance two reasons why the Constitution continues to require in-person voting even after the Election District Provision was removed. First, they propose that if so drastic a change had been intended, the 1966 referendum and supporting materials would have at least mentioned it. Second, they contend that the retention of the provision authorizing absentee ballots for specific groups should be read to prevent mail-in voting by all others. Neither proposition is sufficient to overcome the strong presumption of constitutionality we must afford to the Act.
As to the first, it is not certain that the Constitution ever required in-person voting. Contrary to the parties' assumption here, the Election District Provision may never have been a source of an in-person voting requirement but rather, as explained supra at 
60-61, a provision designed to prevent voters from voting for candidates for whom they [*10]were not entitled to vote.[FN10] Thus, the 1966 amendment's explanatory materials may not have mentioned any change to the in-person voting requirement because the existence of that requirement was unclear and untested.
As to plaintiffs' second argument, because it is not clear that a constitutional amendment was required to permit absentee voting in the first place, little can be inferred from the retention{**43 NY3d at 69} of preexisting constitutional authorization for absentee voting by specific classes of persons. If the Constitution never required in-person voting, the amendments were superfluous and could not be interpreted to add a restriction when they are worded as expansions. But even if plaintiffs were correct in their contention that the Election District Provision was the source of a constitutional in-person voting requirement, the elimination of that provision cannot reasonably be interpreted to have converted a voting expansion (the authorization for absentee voting by specified groups) into a prohibition clear enough to overcome the strong presumption of constitutionality that we must afford to the Act.
Under the interpretive aid of expressio unius est exclusio alterius, we may resolve ambiguity in a statute by looking to what a legislature has expressly included to conclude that other, dissimilar items were meant to be excluded (see McKinney's Cons Laws of NY, Book 1, Statutes § 240, Comment). The canon applies with particular force where a statute creates provisos or exemptions, because "the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned" (id.). Plaintiffs' resort to that doctrine here is unavailing. They contend that because article II, § 2 lists certain groups that the legislature may permit to vote by absentee ballot, we should interpret the Constitution to exclude all others. Even putting aside whether expressio unius is appropriate when interpreting the Constitution, that aid is unhelpful here.
If section 2 had been adopted against a blank slate, plaintiffs' argument would have more force.[FN11] However, as discussed previously, the original grant of authority (for Union soldiers) was{**43 NY3d at 70} adopted to respond to an unprecedented wartime exigency where different views about the Constitution were strongly held, and the provision was amended as a political solution that bypassed the legal question of what the Constitution required. Moreover, if one accepts plaintiffs' view that the Election District Provision was the source of the in-person voting requirement, then section 2 should be viewed as enumerating exceptions to that requirement, not as itself creating a general rule prohibiting the legislature from allowing absentee voting in any other circumstances. Thus, the removal of the Election District Provision would have the effect of rendering the exceptions unnecessary, rather than converting the exceptions themselves into a general rule. Instead, plaintiffs' expressio unius argument would have us hold that the 1966 amendment, which was expressly intended to broaden voter participation, had the silent effect of converting [*11]section 2—which was itself intended to broaden voter participation—into the repository for a ban on in-person voting. Expressio unius assists when its premise is true: that because the legislature listed certain things, it meant to exclude others. Here, however, that premise is false: we cannot infer that because the legislature acted several times to make voting easier for people outside their election districts, that when it acted in 1966 to further expand voting,[FN12] its intent was to restrict it.
Plaintiffs' remaining point is that if the Constitution does not require in-person voting, section 2 is superfluous, and we should not read provisions of a statute (or constitution) to be superfluous. But the very point of the 1864 constitutional{**43 NY3d at 71} amendment—which first introduced the absentee ballot exception—was to circumvent an uncertainty as to what the Constitution required. That is, contemporaneous events show that the original constitutional amendment may well have been superfluous if the Constitution did not limit voting to in-person voting. Only now are we called on to pass on that question, and "superfluity" in this context would mean only that the legislature took legally unnecessary, though lawful, steps to achieve a desired result. Even under plaintiffs' view that the Election District Provision imposed an in-person voting requirement, we would conclude that the elimination of that provision in 1966 rendered section 2 a historical remnant that the legislature failed to clean up. As an example, the 1864 constitutional provision authorizing the legislature to permit absentee voting for soldiers and sailors remained in the Constitution for almost 50 years after the Constitution was amended in 1919 to permit anyone to vote by absentee ballot if their "duties, occupation, or business" required them to be outside of their district of residence (see 1894 {**43 NY3d at 72}NY Const, art II, § 1-a, as added Nov. 4, 1919). Because soldiers and sailors who were absent from their election districts would fall within the terms of those absent because of their "duties, occupation, or business," the special exception for soldiers and sailors was superfluous after the 1919 amendment, but it was not until 1966 that the legislature got around to proposing an amendment that eliminated the superfluous language—despite several other amendments to that section in the interim. In any event, the canon against superfluity is not absolute (RadLAX Gateway Hotel, LLC v Amalgamated Bank, 566 US 639, 645, 646-647 [2012]), and its application here is insufficient to overcome the strong presumption of constitutionality.
E.
Finally, article II, § 7 reinforces the legislature's plenary power to conduct elections in the method it sees fit. Initially, the Constitution mandated that voting be "by ballot" (1821 NY Const, art II, § 4; 1846 NY Const, art II, § 5 [the 1821 and 1846 Constitutions provided that "(a)ll elections by the citizens shall be by ballot, except for such town officers as may by law be directed to be otherwise chosen"]). In 1894, however, the Constitutional Convention removed that requirement, adopting instead language that elections "shall be by ballot, or by such other method as may be prescribed by law" (1894 NY Const, art II, § 5, now NY Const, art II, § 7 [emphasis added]). That language allowed the legislature to authorize any "method" for elections. A "method" is "a procedure or process for attaining an object" or "a way, technique, or process of or for doing something" (Merriam-Webster.com Dictionary, method [https://www.merriam-webster.com/dictionary/method]); voting by mail is a "method" of conducting an election.
Importantly, the Convention extensively debated an alternative amendment that would have authorized elections to be conducted by ballot or by voting machine but rejected that in favor of the broader language authorizing the legislature to approve any other method. Delegates such as Hamlin opposed the broader amendment on the ground that it would allow "any machine in the future [to be] used," and that "[i]f the time shall ever come when there is some device that has been demonstrated after repeated experiments to be successful, it will be ample time for the people of this State to put it in their Constitution" (3 Rev Rec, 1894 NY Constitutional Convention at 85-86). [*12]Rejecting that view, the Convention adopted the broad amendment, supported by delegates who explained that "in case the Legislature shall deem it advisable in the future, in view of improvements which may be made, to adopt any one of them, the Legislature will be authorized to do so" (id. at 88-91). The provision was revised to ensure that the legislature possessed the maximum flexibility to determine the method of elections, limited to methods that preserved "secrecy in voting" (id. at 93).[FN13] Indeed, although no " 'inventive genius' was needed to envision putting a stamp on an envelope" in 1894 (dissenting op at 
106), the Convention was not deciding whether to al{**43 NY3d at 73}low voting by mail (or voting by machine); it was deciding whether the legislature should be given unfettered authority to determine the method of voting in the future, known or unknown (see 3 Rev Rec, 1894 NY Constitutional Convention at 92 ["It is not a question as to whether the people shall be permitted to vote by a machine or by method other than that now prescribed by law, but it is a question whether or not this Convention is willing to give to the Legislature a permission to act on its own judgment as to the method of voting to be pursued by the people"]).
The Convention's history expresses the amendment's clear purpose to permit future legislators to determine the method of voting—expressly emphasizing the need to empower the legislature to adapt to technological changes and to improve the efficiency of voting. Where the preexisting limit of "by ballot" limited the legislature's plenary power, adding "or by such other method" eliminated the restriction that votes be by ballot, and affirmatively stated that any other method—including those that could not even be thought of at the time—would be allowed by the Constitution. The broad grant of power in the amendment is difficult to reconcile with the proposition that voting must be conducted in person, especially because the Constitution does not expressly require as such.
IV.
Admittedly, the recent sequence of events is troubling. In 2019 and 2021, the legislature passed resolutions authorizing a ballot referendum to amend the Constitution to permit voting by mail and, in 2021, informed the voters that if they wished to be able to vote by mail, they needed to vote to amend the Constitution. The voters considered the proposition and voted against it. Having lost the question before the voters, the legislature then decided that no constitutional amendment was required and passed the Act. Upholding the Act in these circumstances may be seen by some as disregarding the will of those who voted in 2021. But our role is to determine what our Constitution requires, even when the resulting analysis leads to a conclusion that appears, or is, unpopular (see e.g. Marbury v Madison, 1 Cranch [5 US] 137, 178 [1803] ["It is emphatically the province and duty of the judicial department to say what {**43 NY3d at 74}the law is"]).[FN14]
The essence of our concurring and dissenting colleagues' opinions is our consideration of the constitutional history pertinent to voting is improper, because the text of the Constitution is absolutely clear (see concurring op at 
75, 83-84, 86-87, 90; dissenting op at 97, 98-102, 109, 111, 114). That each insists the text is clear in diametrically opposed ways[FN15] demonstrates the soundness of our approach. Had there been a clear, unequivocal, and persistent understanding by our coordinate branches that the Constitution required in-person voting, this would be a more difficult case. However, the lack of textual support for an in-person voting requirement and the equivocal nature of the constitutional history regarding such a requirement do not allow us to overcome the very strong presumption of constitutionality we must afford to the Act.
Accordingly, the order of the Appellate Division should be affirmed, without costs.

Rivera, J. (concurring).
Plaintiffs challenge the Early Mail Voter Act—which permits early voting by mail-in ballot—on the sole ground that, with the exception of absentee voters, the State Constitution requires all eligible voters to cast their ballots in person. I join in the result to affirm the dismissal of plaintiffs' complaint in its entirety because there is no express or implied constitutional limitation on the legislature's power to allow mail-in voting. But I cannot agree with the majority's path to this conclusion. I find no support for the majority's ahistorical questioning of the import of People ex rel. Lardner v Carson (155 NY 491 [1898]). Nor do I share the majority's radical view that, for close to two centuries, our State's elected officials{**43 NY3d at 75} acted as if "it [wa]s not certain that the Constitution ever required in-person voting" and were therefore unsure of the scope of the legislature's power to regulate elections (majority op at 
68-69). That view is driven in part by the majority's speculation about political motives of various different legislators from the 1800s to today and its criticism of legislative conduct, neither of which are proper considerations for this Court because what controls is the Constitution's text. The majority's ill-advised approach needlessly complicates a straightforward analysis and gives the appearance of rationalizing what the majority views as untoward political machinations. The dissent, for its part, reads into the Constitution an in-person requirement by implication unsupported by the text and our rules of construction. Properly applied, the presumption in favor of constitutional [*13]validity, well-established rules of construction and our precedent support my conclusion that although at one time the Constitution required in-person voting, the Constitution as currently written does not prohibit the legislature's enactment of the challenged statute.
I.
Article II, titled "Suffrage," embodies our democratic principle of a government by and for the people and protects the right of eligible voters to choose their elected representatives (NY Const art II). The right to vote " ' "is of the most fundamental significance under our constitutional structure" ' " (Hoehmann v Town of Clarkstown, 40 NY3d 1, 6 [2023], quoting Matter of Walsh v Katz, 17 NY3d 336, 343 [2011], quoting Illinois Bd. of Elections v Socialist Workers Party, 440 US 173, 184 [1979]). It holds this elevated status "as a fundamental political right, because [it is] preservative of all rights" (Yick Wo v Hopkins, 118 US 356, 370 [1886]).
Prior to the Civil War, article II, § 1 of the 1846 New York State Constitution required voters to exercise their right to vote "in the election district of which he shall at the time be a resident, and not elsewhere" (the Election District Provision) (see majority op at 
60-61).[FN1] Contrary to the majority's suggestion that this now-deleted provision was unclear, before its deletion from the Constitution, New Yorkers generally understood{**43 NY3d at 76} that this language required in-person voting at a polling site in the voter's election district.
In 1863, with an upcoming presidential election whose results would affect the war effort and the fact that a large number of voters serving in the army might be unable to cast a vote in their district, the New York State Legislature considered a bill which would permit soldiers to vote wherever they were stationed, even if outside of New York State (see 2 Charles Z. Lincoln, The Constitutional History of New York at 235-236 [1906]).[FN2]
"It was evident that members of the legislature and others felt serious doubt concerning the validity of this measure, for, while the bill was pending in the assembly, a resolution was introduced . . . in that house by Gilbert Dean of New York, to amend the suffrage section of the Constitution by providing for taking the vote of persons absent in the military or naval service of the United States in time of war" (id. at 237).
Governor Horatio Seymour shared this doubt and sent a special message to the legislature "recommending such amendment" (id.). The Governor noted that
"[t]he Constitution of this state requires the elector to vote in the election district in which he resides; but it is claimed by some that a law can be passed whereby the vote of an absent citizen may be given by his authorized representative. It is clear to me that the Constitution intends that the right to vote shall only be exercised by the elector in person" (id. at 237-238 [emphasis added]).
The day following the Governor's message, Senator John Ganson of Buffalo introduced an amendment "to carry the Governor's recommendation into effect" (id. at 238). Meanwhile, an amended version of the military voting law was passed by{**43 NY3d at 77} both houses of the legislature (id. at 238). Governor Seymour vetoed the law stating "that the bill was 'so clearly in violation of the Constitution, in the judgment of men of all parties' . . . and that 'some of those who voted for it openly stat[ed] their opposition to the measure' " (id.). The Senate voted to override the veto, but the Assembly failed to garner enough votes. Prior to the Governor's veto, the Assembly passed the previously-introduced Dean constitutional amendment by a vote of 114 to 1 (id. at 239). The same day as the veto, both houses passed the Ganson amendment which became article II, § 1, and permitted the legislature to enact a law providing for active military personnel who were absent from New York State to vote (id. at 239). An exception to the article II, [*14]§ 1 election district residency voting requirement during war time was thus constitutionally established.
The majority speculates that Governor Seymour's reading was "highly uncertain" (majority op at 
62), that the legislature narrowly failed to override his veto, and that the amendment was a mere political compromise "to circumvent an uncertainty as to what the Constitution required" (majority op at 
70-71). But it strains credulity to believe that the legislature took the more onerous path of pursuing an amendment as a political expediency given the urgency of the upcoming election or, for that matter, did not at least simultaneously attempt to pass the statute and amend the Constitution. Beyond this mere speculation, the majority attempts to shore up its view not with other contemporaneous sources on the meaning of our State's Constitution in effect at the time, but by reference to decisions from other states construing their own constitutions—observing that some viewed their similarly-worded constitutions as requiring in-person voting while others did not (see majority op at 
62-63). Seizing on this divergence, the majority concludes that "no result was then thought as indisputably correct" (id. at 
63). The majority fails to explain how other state's observations bear on the meaning of New York's Constitution during the relevant time period. Further undermining the majority's "uncertainty" argument is the fact that article II, § 1 was expanded several times by further amendment to include certain non-military voters who were absent from their residence or unable to appear in person at the polls. This provision eventually became what is currently article II, § 2, which states:
"The legislature may, by general law, provide a manner in which, and the time and place at which,{**43 NY3d at 78} qualified voters who, on the occurrence of any election, may be absent from the county of their residence or, if residents of the city of New York, from the city, and qualified voters who, on the occurrence of any election, may be unable to appear personally at the polling place because of illness or physical disability, may vote and for the return and canvass of their votes" (NY Const, art II, § 2).
By amendment in 1894, what is now numbered section 7, titled "Manner of voting; identification of voters," was adopted and grants broad authority to the legislature in regulating election matters. It provides, in pertinent part, that "[a]ll elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved" (NY Const, art II, § 7). Although the debate at the 1894 Constitutional Convention largely centered around whether to authorize the use of voting machines, the delegates rejected a narrower amendment that would have permitted only the use of voting machines, instead authorizing the legislature to authorize "other method[s]" of voting (see 3 Charles Z. Lincoln, The Constitutional History of New York at 108-114 [1906]). Several of the delegates expressed their opinion that the amendment would allow the legislature to, in its future wisdom, prescribe certain other methods of voting besides paper ballots if such methods would improve elections (see 1 Rev Rec, 1894 NY Constitutional Convention at 919, 924-925; id. vol 3 at 88, 92-93, 96; id. vol 4 at 442). Thus, the Court has noted, section 7 is "[t]he sole enactment concerning the ballot or method of voting" and "[t]he restriction upon the exercise of legislative wisdom and provision in the matter of elections could scarcely be less stringent" (Matter of Burr v Voorhis, 229 NY 382, 395 [1920]).
Then, in 1898, this Court expounded on the legislative power to designate the location of election districts and polling sites where New Yorkers cast their votes under the Election District Provision. In People ex rel. Lardner v Carson, the Court considered whether votes were validly cast in a Town of Lockport election at a designated election district located just outside the town boundary in the City of Lockport (155 NY 491 [1898]). The Court stated that "[w]e are told that the Constitution enacts that the elector must vote 'in the election district of which he shall at the time be a resident and not elsewhere.' So it does" (id. at 496). The Court rejected a challenge to the placement{**43 NY3d at 79} of the election district outside the geographic boundary of a town, and upheld the validity of the votes cast in that district, concluding that, in accordance with article II, § 1, "the whole subject of creating election districts and locating the polling places where the residents of the district may vote, is with the legislature, and it may lawfully delegate this power to local authorities" (id. at 497). Most instructive is the Court's summary of the constitutionally-mandated voting process:
"The object of the Constitution is to secure to every citizen the right to cast one honest vote. To that end it enacts that he shall vote at his own home with his neighbors, where he is known, and not at some other polling place where he may not be known. But all this is fully complied with when he votes with his neighbors at the place designated by law for that purpose, and whether that place be located on one side or the other of an imaginary line bounding a town or a district is not, in the constitutional [*15]sense, a matter of the slightest consequence" (id. at 503).
Thus, like prior legislatures, the Court also understood the Election District Provision to require in-person voting.
The majority asserts that these "statements" were "wholly unnecessary to [the Court's] holding" in Lardner (majority op at 
64, 64-65 n 8), and attempts to recast Lardner as a decision about "the broad power of the legislature to determine the method of elections" (id. at 
64). That is true but fails to account for the Court's exposition on the purpose of the Election District Provision. Nevertheless, according to the majority, Lardner "could be interpreted in two different ways" which, it frets, "merely adds to the uncertainty as to whether the Constitution requires that voting must be in person" (id. 
at 64-65). But there was no such uncertainty. Instead, the majority now creates it where none ever existed. More to the point, the Lardner Court concluded that "[t]he purpose of the [Election District Provision] was to prevent fraud and repeating" (155 NY at 500), which was achieved, according to the Court, by requiring voters to "vote at [their] own home with [their] neighbors, where [they] [are] known, and not at some other polling place where [they] may not be known" (id. at 503). In 1898, this could mean only voting in-person. Additionally, it is simply unfathomable that the legislature at the time would have "authorize[d] ballots to be mailed to a polling place" (majority op at 
64)—especially {**43 NY3d at 80}if, as the majority insists, the Election District Provision was nothing more than "an anti-fraud measure" (id. at 
61).
Regardless, by amendment in 1966, the Election District Provision—the only language in the Constitution that served as a basis for an in-person requirement—was excised from the Constitution and voter qualifications were reduced as part of an effort to increase voter participation (see 1965 NY Senate-Assembly Concurrent Resolution S5519, 1965 NY Laws Appendix at 2783-2784 [proposing amendment to article II, § 1]; Rep of Joint Legis Comm to Make a Study of the Election Law and Related Statutes, 1966 NY Legis Doc No. 30 [acknowledging objective to "(l)iberaliz(e) . . . laws pertaining to registration and voting to achieve an increase in voter participation"]). The amended language stands today. Article II, § 1 provides:
"Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election" (NY Const, art II, § 1).
In the years following the 1966 amendment, the legislature continued its preference for in-person voting, but also has expanded remote voting several times. First, in 1982 the legislature passed a law permitting election workers to vote by "special ballot" to be "delivered" to their local board of elections (see Election Law § 11-302). In 1996, the legislature expanded this option to victims of domestic violence, and in 2016 to emergency responders (see Election Law §§ 11-306, 11-308). All three of these expansions were accomplished without additional constitutional amendment, thereby evincing a legislative understanding that after 1966 the Constitution did not require in-person voting.
The majority suggests and the dissent contends that the 1966 amendment was not the demise of in-person voting, in part relying on the 1967 Temporary Commission on the Constitutional Convention's comment that removal of the Election District Provision might " 'bar the [l]egislature from prescribing absentee voting in cases not within the scope of' " section 2, but also might " 'give the [l]egislature unrestricted discretion over absentee voting' " (majority op at 
65-66; dissenting op at 108, quoting 1967 Rep of Temp St Commn on{**43 NY3d at 81} Constitutional Convention, Rep No. 4, The Right to Vote at 51 n 28). This musing, which the Temporary Commission relegated to a footnote, noticeably grapples with none of the history leading up to and including Lardner (155 NY at 491), and it therefore adds little weight to either the majority's or the dissent's positions regarding the deletion's effect.
In 2021, the legislature again attempted to expand absentee voting—this time to all voters and this time via a ballot initiative (2019 NY Senate-Assembly Concurrent Resolution S1049, A778; 2021 NY Senate-Assembly Concurrent Resolution S360, A4431), proposing a constitutional amendment as follows:
"The proposed amendment would delete from the current provision on absentee ballots the requirement that an absentee voter must be unable to appear at the polls by reason of absence from the county or illness or physical disability. Shall the proposed amendment be approved?" (New York State Board of Elections, Past Election Results, Authorizing No-Excuse Absentee Ballot Voting, available at https://results.elections.ny.gov/contest/590 [last accessed Aug. 5, 2024]).
The provision was defeated at the polls by a slim margin.[FN3]
Thereafter the legislature passed—and the governor signed—the Early Mail Voter Act, which went into effect on January 1, 2024, and which strives to "make New York State a leader in engaging the electorate" by "meeting voters where they are and opening up greater opportunities for people to have their choices made on the ballot" (Senate Introducer's Mem in Support, Bill Jacket, L 2023, ch 481 at 10).[FN4] In a joint letter urging the Governor to sign the Act into law, its Senate and Assembly{**43 NY3d at 82} sponsors conveyed their understanding of a "vote-by-mail structure" as "distinct from absentee voting" (Bill Jacket, L 2023, ch 481 at 17). To that end, the Act authorized all registered voters in New York to apply to "vote early by mail . . . in any election . . . in which the voter is eligible to vote" (Election Law § 8-700 [1]). The Act provides that a registered voter wishing to vote by mail must apply to do so and that such applications must be received by a local Board of Election "not later than the tenth day before the election for which the ballot is first requested" (id. § 8-700 [2] [d]).
The Act includes various integrity checks and opportunities for a voter to confirm that their ballot has been timely received and considered. For example, upon timely receipt, the Board of Elections (BOE) must confirm that the applicant is "a registered voter of the county or city at the address listed in the application and is eligible to vote in the election or elections for which the application is filed" and, if the applicant fails to meet the qualifications for mail-in voting, the BOE must immediately notify the applicant of the rejection and its reasons therefor (id. § 8-702 [1]-[2]). Upon approving an application, the BOE must send the approved applicant "an early mail ballot," along with a postage-paid return envelope (id. § 8-704 [1]-[2]). The ballot is "cast and counted" if received by the close of polls on election day or postmarked by that date and received no later than seven days thereafter (id. § 8-710 [1]).[FN5] The Act also requires the State BOE to maintain, with the assistance of local BOEs, an integrated "electronic early mail ballot tracking system" that "may be integrated with the United States Postal service tracking system" which allows a voter to confirm whether the BOE, inter alia, "received such voter's completed early mail ballot" and "counted or rejected" it (id. § 8-712 [1], [3] [e], [g]).[FN6] To account for its new authorization of early voting by mail, existing canvassing procedures apply to "early mail . . . ballots" (L 2023, ch 481, § 22).
[*16]{**43 NY3d at 83}II.
A.
Plaintiffs contend that in-person voting has always been understood as constitutionally required with the only exception being absentee voting for designated groups of eligible voters, as authorized in article II, § 2. They argue that the Act establishes unrestricted absentee voting in contravention of the limits in section 2 and, if permitted to stand, would implicitly and in practice render article II, § 2's absentee voter qualifications superfluous. Defendants respond that the complaint was properly dismissed because there is no express or implied constitutional prohibition on voting by mail and the legislature has plenary authority to regulate elections.
"It is well settled that [l]egislative enactments are entitled to a strong presumption of constitutionality, and courts strike them down only as a last unavoidable result after every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (White v Cuomo, 38 NY3d 209, 216 [2022] [internal quotation marks and citations omitted]). "It has been our repeated admonition, in light of our obligation to respect the powers of a coequal branch of government, that legislation should not be declared unconstitutional unless it clearly appears to be so and that all doubts should be resolved in favor of the constitutionality of an act" (id. at 228-229 [internal quotation marks omitted]). Moreover, the Court has long acknowledged that our State Constitution vests the legislature with "plenary power over the whole subject of elections" (Lardner, 155 NY at 502; see also Matter of Burr, 229 NY at 388; Matter of McAneny v Board of Estimate & Apportionment of City of N.Y., 232 NY 377, 389-390 [1922]). Application of those principles here compels a conclusion that plaintiffs fail to meet "the heavy burden of showing that [the Act] is unconstitutional" (People v Foley, 94 NY2d 668, 677 [2000]).
To the extent that the majority's errant comment that, "[h]ad there been a clear, unequivocal, and persistent understanding by our coordinate branches that the Constitution required in-person voting, this would be a more difficult case" (majority op at 
74) suggests that individual legislators' erroneous interpretations of the Constitution control our analysis, that is plainly incorrect. This Court is the final arbiter of the meaning of the Constitution in that it is "vested with a unique role and review {**43 NY3d at 84}power over the constitutionality of legislation" (Cohen v State of New York, 94 NY2d 1, 11 [1999], citing Marbury v Madison, 1 Cranch [5 US] 137 [1803]). As the Court has repeatedly explained, "policy initiatives" are "within the province of the Legislature," while issues concerning "whether the Legislature has met its constitutional obligations" are "within the province of this Court" (Matter of Maron v Silver, 14 NY3d 230, 263 [2010], citing Marbury, 1 Cranch [5 US] at 177). And we have, of course, on prior occasions, disagreed with the legislature's interpretation of the Constitution and declared its enactments invalid (see e.g. id.; People v LaValle, 3 NY3d 88, 120, 130-131 [2004]). Therefore, the Court cannot determine the constitutionality of the Act by reference to an alleged uncertainty of some legislators as to whether the Constitution ever contained an in-person requirement, but instead must determine whether plaintiffs have identified a specific provision of the current Constitution that requires in-person voting either "expressly or by necessary implication" (Silver v Pataki, 96 NY2d 532, 537 [2001]).
B.
In resolving the question of the legality of the Act, we look to the text of the Constitution (Matter of Harkenrider v Hochul, 38 NY3d 494, 509 [2022]), here article II, " 'and give to the language used its ordinary meaning' " (Matter of Hoffmann v New York State Ind. Redistricting Commn., 41 NY3d 341, 359 [2023], quoting Matter of Sherrill v O'Brien, 188 NY 185, 207 [1907]). Further, "[a]ll parts of the constitutional provision . . . must be harmonized with each other as well as with the general intent of the whole" (id. [internal quotation marks omitted]).
Until 1966, article II, § 1 contained the only language that was understood and interpreted to require in-person voting at an election district—the Election District Provision. It is undisputed that this language was removed when section 1 was amended in 1966 and has never been readopted by amendment or statute (see majority op at 
65; dissenting op at 107-108). Thus, since 1966, the Constitution has lacked any express language suggesting an in-person voting requirement.
Plaintiffs mount a textual argument based on section 1's mandate that all eligible voters "shall be entitled to vote at every election." The majority agrees with me that the phrase "at every election" does not by its terms refer to a brick-and-{**43 NY3d at 85}mortar location (see majority op at 
59-60). If plaintiffs' reading of section 1 reflected the intent of the people who amended it in 1966, then section 1 would have retained the reference to election districts. Instead, this mandated entitlement—situated in section 1's voter qualifications provision—guarantees the right to vote to every [*17]person who satisfies the age and residency requirements. The majority further agrees with me that the word "at" may be used to denote both the location and time of some specific event (see Webster's Third New International Dictionary, Unabridged 136 [2002]; Oxford English Dictionary Online [Oxford University Press 2024], at, http://www.oed.com [last accessed Aug. 20, 2024]). The event at issue here—an election—does not occur within any one specific place as would, for example, the opening session of the legislature in Albany. Rather, voting in an election takes place simultaneously at many places within a set time period. Thus, placed in context and properly understood, "at every election" carries no different meaning from "in every election"—both phrases communicate that an eligible voter may exercise the franchise during every electoral cycle opportunity.[FN7] The manner in which a voter may do so is a different matter left within the legislature's "plenary power over the whole subject of elections" (Lardner, 155 NY at 502; see also Matter of Burr, 229 NY at 388; McAneny, 232 NY at 389-390), and by authority of section 7, which provides that elections "shall be by ballot, or by such other method as may be prescribed by law" (NY Const, art II, § 7 [emphasis added]). All but one member of the Court agrees with the obvious: voting by mail is a "method" of voting (id.; compare majority op at 
71-73, with dissenting op at 105-106).[FN8] The dissent's contrary view is based on a dictionary definition of " 'ballot' " as " '[a]n instrument, such as a paper or ball, used for casting a vote' " (see dissenting op at 
100 [emphasis added], quoting Black's Law Dictionary [12th ed 2024]). This definition cuts against the dissent's position because a mail-in ballot is a{**43 NY3d at 86} "paper . . . used for casting a vote" (id., quoting Black's Law Dictionary [12th ed 2024]).
The dissent is mistaken in its assertion that "the more logical reading" of section 7 is that it "grants authority to adopt modernized instruments for recording votes" (dissenting op at 
99), considering that the 1894 Constitutional Convention considered and rejected a version of it that would have required voting "by ballot, or by the use of a voting apparatus" in favor of the broader language it still contains to this day (3 Charles Z. Lincoln, The Constitutional History of New York at 109). Insofar as the dissent relies on the premise that methods of voting aside from in-person voting invite fraud no evidence supports that view (see e.g. dissenting op at 
105 n 3 ["The inability to preserve secrecy in the process reinforces the conclusion that absentee balloting is not available to the legislature as a 'method' by which elections could be conducted"]).
Plaintiffs' and the dissent's position that, even without this language, it has always been commonly understood that the constitution requires a voter to personally cast their ballot on election day (see dissenting op at 
100-102) ignores at least two fundamental canons of construction. First, we are bound by the plain text of the Constitution (see Matter of Harkenrider, 38 NY3d at 509). In other words, we must accept the words proposed by the legislature and adopted by the people, not intuit some hidden meaning contrary to the common understanding of the language actually chosen at the time of enactment or claim, as the majority does, some uncertainty about its meaning as a way to create constitutional gaps and ambiguities where none exist (see id. at 509 ["In construing the language of the Constitution as in construing the language of a statute, . . . (we) look for the intention of the People and give to the language used its ordinary meaning"], quoting Matter of Sherrill, 188 NY at 207]; Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 91 [2019] [" 'Absent ambiguity the courts may not resort to rules of construction to (alter) the scope and application of a statute' because no such rule 'gives the court discretion to declare the intent of the law when the words are unequivocal' "], quoting Bender v Jamaica Hosp., 40 NY2d 560, 562 [1976]; Finger Lakes Racing Assn. v New York State Racing & Wagering Bd., 45 NY2d 471, 479-480 [1978] ["Courts are constitutionally bound to give effect to the expressed will of the Legislature and the plain and obvious meaning of a statute is always preferred to any curious, narrow or hidden sense that{**43 NY3d at 87} nothing but a strained interpretation of [*18]legislative intent would discern"]). Here, again, the only language setting out an in-person requirement was deleted by constitutional amendment in 1966. Second, "[w]hen provisions contained in an original act are omitted from an amendatory act, it is reasonable to presume that they were intentionally omitted" (McKinney's Cons Laws of NY, Book 1, Statutes § 193, Comment). Indeed, "the very purpose and effect of an amendment is to amend the relevant portion of the Constitution, effectively repealing and voiding any prior version of the particular section so amended" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 22 NY3d 606, 625 [2014]).
Plaintiffs and the dissent invoke the principle of expressio unius est exclusio alterius to argue that because article II, § 2 sets forth who may vote absentee, a fortiori, this provision and the Constitution as a whole exclude anyone else from voting other than in-person (see dissenting op at 
97-98). Such negative implication is misplaced. Under this canon, " ' "[w]here a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" ' " (Town of Aurora v Village of E. Aurora, 32 NY3d 366, 372-373 [2018], quoting Matter of Town of Riverhead v New York State Bd. of Real Prop. Servs., 5 NY3d 36, 42-43 [2005], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 240, Comment at 411-412 [1971 ed]). Intervenors argue that the canon does not apply when interpreting the Constitution, and that prior decisions from this Court, like Sill v Village of Corning (15 NY 297 [1857]), and People ex rel. Killeen v Angle (109 NY 564 [1888]), appearing to apply the canon to constitutional questions are distinguishable.[FN9] Regardless, the canon simply does not affect our analysis here in light of the plain text of article II, which established an exception to the in-person voting mandated under former section 1.
At bottom, the dissent engages in circular reasoning by positing that application of the canon here renders "a limitation on the legislature's authority to establish absentee voting{**43 NY3d at 88} procedures for any voters beyond the delineated categories in section 2 . . . unavoidable" (dissenting op at 
99). But of course, assuming the canon had any rightful place in our constitutional analysis, this "unavoidable" conclusion would follow only if one were to grant the very proposition that the dissent falls short in proving—namely that all mail-in voting is absentee voting. But absentee voting as established in article II, § 2 was adopted for those who could not physically return to their residence or for whom the burden to do so would be a barrier to exercising the franchise. Mail-in voting is available to all eligible voters, including those who would rather not travel to their designated polling site. Thus, while absentee voting was designed for those unable to comply with an in-person requirement, mail-in voting addresses other obstacles and inconveniences.
The deletion of that mandate by amendment in 1966, and the retention of the legislature's existing broad plenary authority under section 7 to enact methods for casting votes, makes inapt plaintiffs' negative implication as to the meaning of section 2. In other words, because section 2 was originally enacted as an exception to the in-person voting requirement in section 1, which was later deleted, we cannot imply that the exception is now the general rule it was meant to avoid in limited cases. Plaintiffs' negative implication does not further the original purpose of article II, § 2, and would nullify that part of the 1966 amendment that deleted the election district in-person requirement. Indeed, the dissent's concern that the 1966 removal of the Election District Provision requires undesired acceptance of either superfluity or continuation of the same limitation via negative implication of section 2 (see dissenting op at 
108-109) is unfounded. The purpose of the 1966 amendment was to expand voting opportunities and facilitate casting a vote, not, as plaintiffs would have it, to reaffirm and entrench historic barriers to the franchise.[FN10] Further diminishing the force of this view is the fact that article II, § 2 is phrased in permissive language. It authorizes, but does not [*19]require, the legislature to adopt special voting procedures for registered voters falling within certain discrete classes (see NY Const, art II, § 2).
{**43 NY3d at 89}Likewise unpersuasive are plaintiffs' claims that legislative extensions of special balloting procedures to election workers (see Election Law § 11-302), domestic violence victims (see id. § 11-306), and emergency responders (see id. § 11-308) in 1982, 1996, and 2016, respectively, suggest that the legislature has understood the Constitution as requiring in-person voting when it passed those statutes. The Constitution, as amended in 1966 under which we live today, suggests no such requirement. Instead, because in-person voting was the legislative preference after 1966, these amendments to the Election Law were in accordance with the law, rooted in that preference, as it existed at that time. Put another way, although after 1966 no express language supported a constitutional mandate for in-person voting, the legislature continued in-person voting for the eligible voting population with statutory carveouts for defined subcategories of voters for whom in-person voting was an obstacle to accessing the franchise (see Senate Introducer's Mem in Support, Bill Jacket, L 1982, ch 178 at 5 [noting that "(p)oll clerks and inspectors of election(s) must serve continuously from an hour before the polls open . . . until well after the polls close" and, when serving outside their election districts, "frequently are deprived of the opportunity to vote"]; Senate Introducer's Mem in Support, Bill Jacket, L 1996, ch 702 at 7 [noting that remote voting for intimate-partner violence victims afraid to disclose their locations would "allow( ) them to exercise their right to vote without placing them in greater jeopardy"]; Senate Introducer's Mem in Support, Bill Jacket, L 2016, ch 485 at 7 [noting that the objective of Election Law § 11-308 was to ensure that "emergency responders . . . will not lose their right to vote on account of service in response to an emergency"]).
The majority shares my view that the dissent's attempt to ground the legislature's authority to permit alternative methods of voting for these classes in article II, § 2 fails (see generally majority op at 
67-68; dissenting op at 109-110). Section 2, of course, authorizes the legislature to implement absentee voting for voters "absent from the county of their residence or, if residents of the city of New York, from the city" (NY Const, art II, § 2). Poll workers covered by Election Law § 11-302 are completely outside that category since "[n]o person shall be certified or act as . . . [a] poll clerk who is not . . . a resident of the county in which he or she serves, or within the city of New York, of such city" (Election Law § 3-400 [6]). Nor {**43 NY3d at 90}are domestic violence victims or emergency responders covered under Election Law §§ 11-306 and 11-308 required to show absence from their counties of residence before voting using an alternate method.[FN11]
The fact that the legislature may have continued in-person voting after 1966 for the general eligible voting population does not affect my analysis. Legislative preferences and practices need not—and often do not—press constitutional limits and, just as the legislature transgressed no such limit when it authorized alternative voting methods for the classes of persons described above, it likewise crossed no constitutional lines by statutorily adopting early voting by mail decades after elimination of the constitutional mandate.
[*20]III.
Plaintiffs' reliance on limited legislative history in support of their interpretation—and the majority's speculation over the import of that history—is also misplaced. Ordinarily, our analysis begins and ends with the clear text of the Constitution in effect today (Matter of Harkenrider, 38 NY3d at 509). In other words, we do not rely on legislative history to interpret what is plain. Although at times we have, when confronted with clear text, noted that the legislative history confirms our interpretation (see e.g. Riley v County of Broome, 95 NY2d 455, 463 [2000], citing McKinney's Cons Laws of NY, Book 1, Statutes § 124), we have also observed that when, as here, the text "is clear and unambiguous, . . . there is no need to resort to legislative history" (Xiang Fu He v Troon Mgt., Inc., 34 NY3d 167, 173 [2019]).
Even were it necessary to look beyond the face of article II, contrary to the majority's and dissent's respective views (majority op at 
58-68; dissenting op at 102-111), the legislative history confirms what the constitutional text makes plain: the{**43 NY3d at 91} people adopted a structure that expands access to the franchise by reducing voter residency requirements and eliminating mandatory in-person voting. The adoption of the 1966 amendment to article II, § 1, under which we live today, occurred amidst a wider movement to "[l]iberaliz[e] . . . laws pertaining to registration and voting to achieve an increase in voter participation" (Rep of Joint Legis Comm to Make a Study of the Election Law and Related Statutes, 1966 NY Legis Doc No. 30 at 11). As early as three years before the amendment's adoption, the Joint Legislative Committee to Make a Study of the Election Law and Related Statutes published a report urging that our State's election laws not fall into a state of antiquity, but remain "in step with our ever-changing times . . . to facilitate the voting process to enable every voter to vote with the least possible inconvenience" (Rep of Joint Legis Comm to Make a Study of the Election Law and Related Statutes, 1963 NY Legis Doc No. 33 at 15). In fact, the report mentioned a proposal to "liberaliz[e] absentee balloting" (id. at 12).
Nor are plaintiffs or the dissent correct that we should consider whether the 1966 amendment was presented to the voters as intended to eliminate an in-person voting requirement in fact and in practice (see dissenting op at 
95). In Golden v Koch, the Court unanimously abandoned its prior approach, adopted in Matter of Kuhn v Curran (294 NY 207 [1945]), that looked to "the meaning that the words . . . would convey to the 'intelligent, careful voter' " because in practice "this standard ha[d] become little more than an empty legal fiction" (49 NY2d 690, 694 [1980]).[FN12] The Court observed that,
"[w]hile the concept that publicly approved provisions of law must be construed by seeking the intent of the electors approving them has surface appeal, when one considers the documents by which voters are apprised of constitutional or charter amendments, the places at which they are made available, and the time normally required to peruse, much less digest, the content of such materials, it is clear that so few voters do what the 'intelligent, careful voter' rule assumes they do that this standard has become little more than an empty legal fiction" (id.).
{**43 NY3d at 92}The Court, thus, applied certain of our "traditionally accepted standards of statutory construction" for construing constitutional amendments (id.).
When applying these canons, we are not engaged in mere thought exercises. Our judicial role vests us with the tremendous responsibility of examining the words of each constitutional provision "[a]s adopted by the [p]eople" based on "the words in which the will of the [p]eople has been expressed" (People v Rathbone, 145 NY 434, 438 [1895]). The dissent is correct that "[w]e have never abandoned the requirement that we 'look for the intention of the People' in construing the language of the Constitution (dissenting op at 
112, quoting Hoffman, 41 NY3d at 359 [internal citations and quotation marks omitted]). But the dissent misreads my textually-focused analysis as abandoning this commitment. After all, "[t]he Constitution is the basis upon which rests that complicated social organization called the state" and therefore "[i]t must be presumed that its framers understood the force of the language used and, as well, the people who adopted it" (Rathbone, 145 NY at 438). And, for the reasons discussed, the relevant text here establishes that the people eliminated in-person voting by constitutional amendment in 1966.
Plaintiffs' argument—adopted by the dissent (see dissenting op at 
100, 108-109)—that upholding the Act as constitutional would render article II, § 2 superfluous because absentee voters can now vote by mail pursuant to the Act—is similarly unpersuasive for several reasons. The premise of this argument is fatally flawed because the canon against superfluity is not absolute. It can be surmounted, for example, "by textual indications that point in the [*21]other direction" (RadLAX Gateway Hotel, LLC v Amalgamated Bank, 566 US 639, 645, 646-647 [2012]) or "where it is practicable to give each [term] a distinct and separate meaning" (Cohen v Lord, Day & Lord, 75 NY2d 95, 100 [1989]). The dissent incorrectly asserts that neither exception applies (see dissenting op at 
100). Here, the legislature had, until the Act's passage, continued in-person voting, which was the default when the Constitution was amended in 1966 and only now has exercised its authority to implement an alternate "method" of voting (NY Const, art II, § 7). Further, section 2 also allows the legislature to provide a manner, time and place to vote for constitutionally-defined eligible absentee voters—i.e., those persons outside the county or New York City or who are unable to appear personally at the polling site due to an illness{**43 NY3d at 93} or disability. Thus if, in the future, the legislature chooses to end early mail-in voting and reinstate in-person voting, the legislature may still provide a method for absentee voters to exercise the franchise in every election in which they are eligible.
As a textual matter, the majority is incorrect that section 2 is a historical remnant (majority op at 
71). Although there is significant overlap between early mail-in voting and absentee voting, there are meaningful differences that benefit the narrow subcategories of voters eligible to vote absentee. For example, article II, § 2 enables the legislature to design and implement special voting procedures exclusively for the enumerated subcategories of eligible voters without providing the same for other voters generally.[FN13] Section 2 does not specifically require that method to be mail-in voting. Even in the event the Act were repealed, this special authority would remain intact, and thus the Act does not render section 2 superfluous.[FN14]
{**43 NY3d at 94}IV.
Plaintiffs' remaining argument—which the dissent endorses (see dissenting op at 
111-114)—that the Act is an end run around the 2021 rejection of a ballot proposal that would have authorized no-excuse absentee voting—is also unpersuasive. Plaintiffs contend that the legislature's actions following the failed ballot initiative are an anti-democratic disregard of the will of the voters who rejected the no-excuse absentee amendment. However, the results of the ballot initiative and the legislature's response to its defeat simply have no bearing on the meaning of the Constitution.
In the same vein as the dissent, the majority also judges the legislature's conduct as "troubling" (majority op at 
73). Hand-wringing by members of this Court cannot serve as a factor in our constitutional analysis, and the majority's remarks undermine the public's trust in the judiciary as an independent, non-partisan, institution. The majority's consternation is particularly odd given that, like me, the majority concludes that the legislature has not violated the Constitution. The legislature's passage of the Act may reflect political calculations that are common within and central to the legislative branch of government, but which have no role in our judicial decision-making nor do they impact our traditional rules of interpretation. If the voters—including members of this Court—object to the conduct of the legislature, conduct which is wholly constitutional—as is the case here—the electorate's recourse is at the proverbial ballot box.

Garcia, J. (dissenting).
While the legislature has plenary power, including, as relevant here, the power to make rules and regulations governing elections, the people of the State of New York, through the language of the State Constitution,{**43 NY3d at 95} hold the power to limit that authority. For more than 200 years, the State Constitution has restrained, and been understood to restrain, that plenary power with respect to absentee voting, limiting it to certain categories of voters unable to appear in person because of absence, illness, or physical disability. Just three years ago, the legislature sought permission from the people, in the form of a constitutional amendment, to remove that limit and permit the legislature to enact "no excuse" absentee voting, explaining that it was necessary to change the text of the Constitution before the legislature could do so. The ballot materials provided to potential voters informed them that "[t]he purpose of this proposal is to eliminate the requirement that a voter provide a reason for voting by absentee ballot" by "deleting the requirement currently in the Constitution that restricts absentee voting to people under one of two specific circumstances" (Ballot Proposal 4, 2021 Statewide Ballot Proposal: Abstract). The amendment was defeated by a wide margin, leaving the public to believe the restriction remained.
Nevertheless, shortly thereafter, in 2023, the legislature passed, and Governor Hochul signed into law, sweeping "no excuse" universal absentee ballot voting procedures (see 2023 NY Senate Bill S7394A, 2023 NY Assembly Bill A7632A; Election Law § 8-700 et seq.). The majority approves, reading the limitation on absentee voting out of the Constitution by first attempting to undermine it (majority op at 
58-65, 68-69) and then holding that, in any event, a 1966 constitutional amendment, silently and without notice, removed it (id. at 
65-71). Acknowledging that the legislature's conduct with respect to the failed amendment is "troubling" (majority op at 
73), the majority nevertheless accepts it, making the people's recent vote to preserve the limitation meaningless. I cannot join in that result. Above plenary power and politics, the Constitution establishes a limit, long enshrined, well understood, and recently reinforced, on the legislature's authority to enact absentee voting procedures. The "no excuse" universal mail voting legislation violates that constitutional limitation. I dissent.
I.
Before turning to the constitutional provisions at issue, it is necessary to consider a few aspects of the role of the legislature, the people, and the judiciary in New York's constitutional government.{**43 NY3d at 96}
The legislature has plenary power except as restrained, "expressly or by necessary implication," by the language of the constitution (see Silver v Pataki, 96 NY2d 532, 537 [2001]; People ex rel. Cent. Trust Co. v Prendergast, 202 NY 188, 197 [1911]). Specifically, "[t]he right to vote . . . is defined and regulated by the Constitution and legislative enactments of the state," and "the legislature is free to adopt concerning [voting] any reasonable, uniform and just regulations which are in harmony with constitutional provisions" (Matter of Burr v Voorhis, 229 NY 382, 388 [1920]; see also Matter of Davis v Board of Elections of City of N.Y., 5 NY2d 66, 69 [1958] [legislature has "plenary power . . . to promulgate reasonable regulations for the conduct of elections"]). The function of a state constitution, therefore, is to "provide[ ] limitations on the otherwise plenary, residual, sovereign power of states to make laws and govern themselves" (Robert F. Williams & Lawrence Friedman, The Law of American State Constitutions 4 [2d ed 2023]), and as a result, "very nearly everything that may be included in a state constitution operates as a restriction on the legislature" (id. at 371, quoting Frank P. Grad & Robert F. Williams, 2 State Constitutions for the Twenty-First Century: Drafting State Constitutions, Revisions and Amendments 86-89 [2006]; see also Client Follow-Up Co. v Hynes, 75 Ill 2d 208, 215, 390 NE2d 847, 849-850 [1979] ["Under traditional constitutional theory, the basic sovereign power of the State resides in the legislature (and) . . . (a)ll that needs to be done is to pass such limitations as are desired on the legislature's otherwise unlimited power"]). Accordingly, we must look to the text of the Constitution to determine whether the people have limited the legislature's plenary authority in a manner that makes the Early Mail Voter Act unconstitutional.
In doing so, we recognize the unique role of the people in the making of our Constitution when we interpret its text: "If the guiding principle of statutory interpretation is to give effect to the plain language, especially should this be so in the interpretation of a written Constitution, an instrument framed deliberately and with care, and adopted by the people as the organic law of the State" (Matter of King v Cuomo, 81 NY2d 247, 253 [1993] [citations, internal [*22]quotation marks and brackets omitted]; see Matter of Hoffmann v New York State Ind. Redistricting Commn., 41 NY3d 341, 359 [2023] ["We have long and repeatedly held that '(i)n construing the language of the Constitution as in construing the language of a statute, the{**43 NY3d at 97} courts should look for the intention of the People and give to the language used its ordinary meaning' "], quoting Matter of Sherrill v O'Brien, 188 NY 185, 207 [1907]). So while the burden is high for establishing a conflict between a statute and the Constitution (see e.g. White v Cuomo, 38 NY3d 209, 216 [2022]), when a conflict is found, "courts must not hesitate to condemn [because t]he Constitution is the voice of the people speaking in their sovereign capacity, and it must be heeded" (Matter of New York El. R.R. Co., 70 NY 327, 342 [1877]). The burden cannot be so high as to silence that voice.
Finally, policy arguments surrounding any challenged statute do not factor in our analysis:
"We are not concerned with the policy or expediency of the legislation. Subject only to the restrictions contained in the State and Federal Constitutions, the power of the Legislature is plenary. Obedience must be rendered to statutes which do not offend against such restrictions, even though they may seem to us impolitic; statutes which are beyond the power of the Legislature are invalid, though they may be politically wise" (Village of Kenmore v County of Erie, 252 NY 437, 441 [1930]; but see concurring op at 
 81 [noting "the Early Mail Voter Act . . . strives to 'make New York State a leader in engaging the electorate,' " quoting Senate Introducer's Mem in Support, Bill Jacket, L 2023, ch 481 at 10]).
Courts have "no political maxims and no line of policy to further or to advance," making our duty a "humble one" limited to "construing the constitution by the language it contains" (People ex rel. Wood v Draper, 15 NY 532, 546 [1857]).
II.
A review of the plain text of the provisions at issue here establishes that the people intended the Constitution to limit the legislature's authority to make laws governing absentee voting, and that the Early Mail Voter Act, whatever its merits or flaws as policy, goes beyond those limits and is therefore unconstitutional.
Article II, § 1 sets out the fundamental right of every citizen to vote in all elections and sets minimum age and residency requirements. Section 2 describes two and only two categories of voters for whom the legislature has authority to pass laws{**43 NY3d at 98} governing the "manner in which, and the time and place at which" votes are cast, namely those who are absent from their county of residence or unable to appear personally and cast their votes because of illness or disability. In setting forth these specific conditions for the exercise of legislative authority, the structure of this provision illustrates the maxim expressio unius est exclusio alterius—"where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" (People v Page, 35 NY3d 199, 206-207 [2020], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 240). Section 2's express grant of authority to the legislature to institute absentee voting for the two referenced categories of voters necessarily implies a corresponding lack of authority to do the same for any other categories (see e.g. Silver v Pataki, 3 AD3d 101, 107 [1st Dept 2003] ["Since the (relevant constitutional provision) recites the three permissible methods of alteration by the Legislature, the principle of expressio unius est exclusio alterius should be applied and permits this Court to construe the listed methods as exclusive"], affd 4 NY3d 75 [2004]).
Moreover, the concept of expressio unius is, as we have seen, baked into the State Constitution (see G. Alan Tarr, Understanding State Constitutions at 8-9 [2000] ["Most often . . . these apparent 'grants of power' function as limitations. For in a constitution of plenary legislative powers, an authorization to pursue one course of action may by negative implication serve to preclude pursuing alternative courses that were available in the absence of the 'grant' under the familiar canon of expressio unius est exclusio alterius"]). The charter is at its core a limitation on otherwise plenary power (see Prendergast, 202 NY at 197 ["The legislature has all the power of legislation there is, except as limited by the Constitution, either expressly or by necessary implication"]), and this language in section 2 serves no purpose other than as a restriction on the legislature's authority with respect to absentee voting.
Indeed, while implying that the maxim does not apply to interpretation of 
constitutional provisions, the majority accepts that "[i]f section 2 had been 
enacted against a blank slate, plaintiff's argument would have more force" 
(majority op at 69; see also 229 AD3d 79, 88 [3d Dept 2024] ["(P)laintiffs' reliance on the interpretive maxim expressio unius est exclusio alterius for the premise that article II, § 2 precludes the Legislature {**43 NY3d at 99}from authorizing universal mail-in voting by carving out the only categories of voters entitled to vote by absentee ballot—to the exclusion of others—may well have been plausible prior to the 1966 amendment to article II, § 1"]). Of course, expressio unius is [*23]a textual canon that "focus[es] on the language of the statute itself and the relationships between statutory provisions" (Jacob Scott, Codified Canons and the Common Law of Interpretation, 98 Geo LJ 341, 352 [2010]). The maxim's application does not turn on timing and cannot be applied with a historical gloss; it must instead be applied to the current text "under which we live today" (concurring op at 
89, 91). The majority is critical of an approach that "look[s] only to what remains in the Constitution" (majority op at 
65-66 n 9) when determining what the text means. That seems the point of textual analysis. When the plain meaning of that text is examined, a limitation on the legislature's authority to establish absentee voting procedures for any voters beyond the delineated categories in section 2 becomes not just plausible but unavoidable.
Defendants argue that the language of section 7 reiterates the legislature's plenary authority in this area and in effect trumps section 2. This argument fails. The legislature's plenary power needs no reiteration within the Constitution, and this provision is also best understood as a limit on the legislature's authority. Defendants' alternative reading requires understanding section 7's language "by ballot, or by such other method as may be prescribed by law," as granting an authority so great as to encompass the creation of entirely new systems and procedures of voting, rather than the more logical reading that it instead grants authority to adopt modernized instruments for recording votes—at a polling place. More specifically, defendants argue that it encompasses absentee voting, but a comparison of the text of section 7 with section 2 shows that where that authority is intended, different language is used. In section 2 the legislature is given limited authority with respect to two categories of absentee voters, and only those two, to "provide a manner in which, and the time and place at which," qualified voters may vote. Section 7, by contrast, provides legislative authority to establish that elections "shall be by ballot, or by such other method as may be prescribed by law." The difference in the terms used is the difference in the limited authority granted.
Textually, the alternative interpretation requires separating the term "ballot" and "such other method"—and we have {**43 NY3d at 100}instructed that a general phrase following "words of a particular meaning . . . is to be construed as applying only" to the specific words preceding it (see e.g. People v Shapiro, 50 NY2d 747, 764 [1980]). Using Black's Law Dictionary's definition of "ballot" as meaning "[a]n instrument, such as a paper or ball, used for casting a vote," the phrase "by ballot, or by such other method" refers naturally to another instrument used for lodging and recording votes, not any process by which elections are conducted (Black's Law Dictionary 175 [12th ed 2024]).
The alternative reading of section 7 renders section 2, whether considered exclusive or not, entirely superfluous. If section 7 grants authority to the legislature to provide systems for universal absentee voting by mail, a grant of authority to the legislature to provide for absentee voting for two specific categories of voters is unneeded, and odd. When read, as it must be, alongside section 2, whatever the breadth of section 7's text by itself may be, it is constrained, as would be the legislature's "plenary power," by section 2's specific language on legislative authority with respect to absentee balloting. And while it may be true that "the canon against superfluity is not absolute," one of the only ways in which the canon is "surmounted" is " 'by textual indications that point in the other direction' " (concurring op at 
92, quoting RadLAX Gateway Hotel, LLC v Amalgamated Bank, 566 US 639, 646-657 [2012] [describing how the general/specific canon may be overcome, but holding that it applied to interpretation of Bankruptcy Code provisions]; see also majority op at 
70-71). As in RadLAX, there is "no such indication here" (566 US at 647).[FN1] Rather, reading the text as complementary, section 2 limits whatever authority over absentee voting procedures section 7 might, by a strained reading, be said to permit.
Interpretation of the plain text of the Constitution, as it now stands, leads inexorably to the conclusion that the legislature's authority to permit absentee voting is limited to the two specific categories of voters expressly identified. The Early Mail Voter Act violates that limitation.
That the Constitution limits the legislature's authority over absentee voting is the longstanding interpretation of the relevant{**43 NY3d at 101} constitutional language, historically through the present day. In 1898, this Court held that "[t]he elector must vote at the polls of the election district in which, at the time, he resides, and not elsewhere. No vote can be registered, cast or counted in this state except at the polling place of some election district" (People ex rel. Lardner v Carson, 155 NY 491, 498 [1898]). The majority interprets the clear statement by this Court of the limit on the ability of the legislature to authorize absentee voting as at best "add[ing] to the uncertainty as to whether the Constitution requires that voting must be in person" and more likely to simply reaffirm the legislature's power to determine the method of voting, apparently because this Court was not specifically considering "mail in" voting (majority op at 
64-65). But the rule applies to any form of absentee voting and was central to our analysis in Lardner; there was no need to decide "what is an election district" and "by what power it is made" (Lardner, 155 NY at 496) or to hold, in the majority's paraphrasing, "that the legislature may delegate to localities the power to locate polling places outside of the pertinent election district" (majority op at 
64-65 n 8), if voting was not limited to in person at that polling place (see also 155 NY at 507 [Vann, J., dissenting] [although disagreeing with the result, also noting the need to address the constitutional limitation, and likewise concluding that "(t)he words 'and not elsewhere,' which appear in every Constitution except the first, are an express limitation. The command of the Constitution is that the elector must be a resident of the election district in which he offers his vote, and that he shall be entitled to vote only in that election district"]). The majority's efforts to weaken our holding in Lardner fail.
Over 100 years later, this Court again recognized constitutional limitations on the legislature's authority to pass absentee ballot legislation, noting that the statute under examination, permitting such voting by those unavoidably absent from the county of residence or unable to appear because of illness or physical disability, was "[c]onsistent with the limited circumstances [for absentee voting] contemplated in the Constitution" (Matter of Gross v Albany County Bd. of Elections, 3 NY3d 251, 255 [2004] [prohibiting absentee ballots from voters who failed to articulate "why they were not able to vote at the polls" to be counted (id. at 259)]). The majority now seeks to undermine this abiding interpretation to make the action of the legislature in disregarding the will of the people more palatable.{**43 NY3d at 102} As the Attorney General urged in prior litigation when arguing for an expansive interpretation of the phrase "because of illness" in article II, § 2, for "over a decade . . . [a] legislative view of article II, § 2 has been 'acquiesced in by all departments of the state government,' making it . . . 'a practical construction of the constitutional provision now in question' that 'ought not now to be disturbed' " (brief for Attorney General in Cavalier v Warren County Bd. of Elections, 210 AD3d 1131 [3d Dept 2022] at 32, quoting People ex rel. Einsfeld v Murray, 149 NY 367, 376 [1896]). Even more so a construction that has been adhered to for 150 years.
III.
Consideration of the relevant constitutional history is not "improper" (majority op at 
74); it is the majority's effort to recast our history that is unsound. Underlying the majority's revision is the following principle: while there was a long-standing constitutional restriction requiring a voter to cast a ballot only in the election district where he or she resided, that did not prevent the voter from mailing in a ballot—presumably from anywhere in the world (see majority op at 
61 [voting " 'in the election district' where one resides does not necessarily require that the vote be in person"]; id. at 
68 [same]). In the majority's view, the provision was aimed at preventing fraud only in the sense of voters "traveling to vote for candidates who were not their own representatives" (id. at 
61 [emphasis added]) but not mailing in votes to accomplish the same anti-democratic goal. This defies common sense and runs contrary to our constitutional history.
The New York State Constitution has historically struck a balance between the goal of universal suffrage and concerns about fraud and a compromised electoral process, concerns raised with force in the context of absentee voting (see e.g. 1 Rev Rec, 1915 Constitutional Convention at 897 ["to provide for absentee voting might open the door to fraud"]; Temp St Comm on the Constitutional Convention: The Right to Vote at 52 [Feb. 10, 1967] ["It has been claimed that absentee voting does not have the safeguards that can be provided at the polls—since, for example, it may be difficult to assure that voters cast their ballots in secret, free from improper influences"]; Problems Relating to Home Rule and Local Government, 1938 Rep of NY Constitutional Convention Comm, vol 11 at 169-170 ["The danger of fraud is the source of opposition to any broadening of{**43 NY3d at 103} (the absentee voting section)"]). As this Court recognized, "[a]bsentee voting serves the laudable purpose of opening the voting process to a larger electorate but there are dangers inherent in the system" (Gross, 3 NY3d at 258; see also John C. Fortier & Norman J. Ornstein, The Absentee Ballot and The Secret Ballot: Challenges for Election Reform, 36 U Mich J L Reform 483, 492-493 [2003]). These concerns necessarily apply with the greatest force to mail in voting where the safeguards attendant to appearing in person at the polls are absent.
Residency limitations featured in the first New York Constitution, providing that those qualified to vote would be entitled to do so "within his said place of residence" (1777 NY Const art VII). Then, beginning in 1821, more than 200 years ago, the Constitution explicitly required that voting take place "in the town or ward where [the voter] actually resides, and not elsewhere" (1821 NY Const, art II, § 1).
[*24]
Despite those limitations, Governor Seward warned, in an 1839 speech described as his "annual message," that
"anarchy will surely follow the discovery that the ballot boxes are an uncertain organ of the will of the people. Conscientiously holding the principle of universal suffrage, and indulging no apprehension of its practical operation, if fairly carried out, with proper safeguards against its abuse, I am yet free to confess my fears that it will prove a fatal franchise unless such safeguards be applied" (2 Charles Z. Lincoln, The Constitutional History of New York at 101 [1906]).
He reiterated these concerns in speeches over the course of the following years (id. ["Universal suffrage is . . . a mighty element of power, and requires the most perfect safeguards"]).
The 1846 Constitution restated the same barrier against voting beyond one's residential district (compare 1821 NY Const, art II, § 1 [qualified voters "shall be entitled to vote in the town or ward where he actually resides, and not elsewhere," with 1846 NY Const, art II, § 1 [qualified voters "shall be entitled to vote at such election in the election district of which he shall at the time be a resident, and not elsewhere"]). The accepted interpretation of this language as limiting legislative authority regarding absentee voting is clear from the events surrounding efforts to ensure the franchise of Civil War soldiers in 1863. When legislation to permit these soldiers to cast absentee ballots{**43 NY3d at 104} was proposed, Governor Seymour expressed concern that passage of such a statute would result in a "doubtful or unconstitutional law" and vetoed the legislation (2 Lincoln at 238).[FN2]
The requisite amendment was adopted by the people of the State in 1864, enshrining this right in the Constitution so that section 1 of article II provided that
"in time of war, no elector in the actual military service of the United States, in the Army or Navy thereof, shall be deprived of his vote by reason of his absence from the state; and the legislature shall have power to provide the manner in which, and the time and place at which, such absent electors may vote, and for the canvass and return of their votes in the election districts in which they respectively reside, or otherwise" (1846 NY Const, art II, § 1, as amended Mar. 8, 1864 [emphasis added]).
The issue of absentee balloting for Union soldiers was litigated in other jurisdictions. However, before concluding that those decisions from foreign jurisdictions make a long-standing view of New York's Constitution "highly uncertain" (majority op at 
62), care should be taken to ensure the relevant provisions in those other jurisdictions mirror our language. The only three cases cited by the majority as dispensing with the need for a constitutional amendment concern provisions missing the "and not elsewhere" language then found in our Constitution (see 
majority op at 62; see Morrison v Springer, 15 Iowa 304, 339 [1863] [discussing at length the differences in language of the various state constitutions and emphasizing the importance of paying close attention to the text of the Iowa Constitution]; Lehman v McBride, 15 Ohio St 573, 584 [1863]). In State ex rel. Chandler v Main, the third case cited by the majority, it appears counsel specifically contrasted the New York Constitution's "and not elsewhere" language with the language of the Wisconsin Constitution, in support of the argument that the legislation permitting absentee voting by soldiers was constitutional under the Wisconsin Constitution—and the Wisconsin Supreme Court ruled in his favor (16 Wis 398, 409 [1863]; but see majority op at 
63 n 7 [describing the two {**43 NY3d at 105}significantly different provisions as "hav(ing) precisely the same meaning"]). The constitutional provisions at issue in the three cited cases do not contain the operative language of the New York Constitution and the decisions reinforce, rather than shake, the interpretation given to that language in this State.
The end of the nineteenth century saw the introduction of the language now found in article II, § 7. At that time, article II, § 5 provided that "[a]ll elections by the citizens shall be by ballot," except for town officials. As New York began experimenting with voting machines, the need to amend section 5 became clear and was taken up at the 1894 Constitutional Convention. The Constitution "permit[ted] but one method of voting—that which is known as voting by ballot, and which, through long use, has come to be voting by the deposit of pieces of white paper in the ballot-box" (3 Rev Rec, 1894 Constitutional Convention at 93; see id. at 918 [delegate noting that the Century Dictionary defined ballot as "(1) A little ball used in voting; (2) A ticket or slip of paper used in voting; (3) A method of secret voting by means of small ballots or by printed or written ballots"]). Language was added to permit the legislature to use other methods for recording votes besides the paper ballot, "provided that secrecy in voting be preserved" (1894 NY Const, art II, § 5), so that any method devised by "the inventive genius of some of the citizens of this State" may [*25]be adopted (3 Rev Rec, 1894 Constitutional Convention at 93).[FN3] We must again consider, when looking at the language of the provision, that it was meant to ease a restriction on legislative authority, not as an unnecessary "grant" of plenary power to the legislature (majority op at 
73).
The majority agrees that "[t]he Convention's history expresses the amendment's clear purpose to permit future legislators to determine the method of voting—expressly emphasizing the need to empower the legislature to adapt to technological changes and to improve the efficiency of voting," and acknowledges that the view of the delegates who urged that the amendment "was intended to ensure that the legislature would be{**43 NY3d at 106} unfettered to adapt even then-unknown methods of voting . . . carried the day" (majority op at 
73, 72 n 13, citing 3 Rev Rec, 1894 Constitutional Convention at 85-92). I read the Convention's history similarly—the language of the proposed amendment reflected confidence in progress toward more secure and more accurate mechanical voting methods beyond the problematic "Myers" voting machine (3 Rev Rec, 1894 Constitutional Convention at 83-89; see also id. at 88 ["It seems the height of folly for us to say that we are unwilling that the inventions or devices that may be made or suggested in the next four or five years shall not be adopted"]; id. at 98 [amended language "simply opens the door so that the Legislature may take advantage of the results of inventive genius or the results of any advanced thought of the age"]). But in 1894, no "inventive genius" was needed to envision putting a stamp on an envelope and mailing in a paper ballot.
Given the limited scope of the language in section 7, it was well understood that any expansion of the categories of individuals permitted to vote by absentee ballot beyond those expressly referenced in the 1864 amendment required constitutional amendment (see 2 Rev Rec, 1915 NY Constitutional Convention at 1814-1815 ["The only case of absentee voting that the State of New York has ever recognized was in the case of war . . . . That is the only kind of absentee voting which this State has ever recognized and it will be a long time in my opinion before any Constitution ever permits any such thing as absentee voting"]). The majority accurately states that "for nearly a century . . . when the legislature extended voting to groups of voters who were not present in their election district on Election Day, it did so by proposing a constitutional amendment, to be acted on by popular referendum" (majority op at 
65). Indeed, in 1919, absentee voting was authorized for commercial travelers—those "who may, on the occurrence of any general election, be unavoidably absent from the state or county of their residence because their duties, occupation or business require them to be elsewhere" (NY Const, art II, § 1-a, as added Nov. 4, 1919). This expansion was "not without controversy"; at the time, the New York Times urged voters to reject the amendment and describing absentee voting as " 'a doubtful and even dangerous remedy' where '[t]he danger of fraud is palpable' " (Matter of Gross, 3 NY3d at 255 & n 2 [2004], quoting Four Amendments, NY Times, Oct. 15, 1919, at 16). But, through a vote of the people, the expansion of{**43 NY3d at 107} absentee voting by constitutional amendment continued; in 1923, to allow for absentee voting by inmates of soldiers' homes (NY Const, art II, § 1-a, as amended Nov. 6, 1923); in 1929, to allow patients in veterans' bureau hospitals to vote absentee (NY Const, art II, § 1-a, as amended Nov. 5, 1929); in 1947, to extend the right to family members of those already entitled to vote absentee (NY Const, art II, § 2, as amended Nov. 4, 1947); and in 1955, to permit absentee voting by those who "may be unable to appear personally at the polling place because of illness or physical disability" (NY Const, art II, § 2, as amended Nov. 8, 1955]). The legislature well understood that for each change, for each expansion of absentee voting, the approval of the people was needed.
By 1963, this piecemeal expansion of the categories of permissible absentee voters had created an unwieldy provision. By amendment, the several categories of voters to whom the legislature was authorized to grant the right to vote absentee were consolidated into two broad categories: qualified voters who "may be absent from the county of their residence" and those who "may be unable to appear personally at the polling place because of illness or physical disability" (NY Const art II, § 2, as amended Nov. 5, 1963).
The majority, the Appellate Division, and defendants all ground their analysis in changes made to section 1 three years after this extensive overhaul of section 2 (see majority op at 
65-68; 229 AD3d at 86-88). Before 1966, section 1, in addition to the language providing that qualified voters "shall be entitled to vote . . . in the election [*26]district of which he or she shall at the time be a resident, and not elsewhere," also contained various residency requirements; provided such voters a right to vote "for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to the vote of the people"; included language permitting the legislature to establish "the manner" of voting for those "in the actual military service of the state, or of the United States, in the army, navy, air force or any branch thereof, or in the coast guard, or the spouse, parent or child of such elector, accompanying or being with him or her, if a qualified voter and a resident of the same election district"; and contained permission for those moving election districts within 30 days preceding the election to vote in their prior district (see 1965 NY Senate-Assembly Concurrent Resolution S5519, A923). The 1966 amendment simplified the provision by condensing the language and streamlining the residency requirements:{**43 NY3d at 108}
"Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is twenty-one years of age or over and shall have been a resident of this state, of the county, city, or village for three months next preceding an election" (see NY Const, art II, § 1, as amended Nov. 8, 1966).
Among the provisions removed from the prior version of that section was the "and not elsewhere" language.
There is no legislative history related to the removal of that language. As the Temporary State Commission on the Constitutional Convention reported the following year, in 1967, removal of the "and not elsewhere" language from section 1, alongside retention of the section 2 absentee voting limits, "arguably suggests that Article II, Section 2 is intended not merely to authorize the Legislature to establish absentee voting in certain cases, but to bar the Legislature from prescribing absentee voting in cases not within the scope of that provision" (Temp St Commn Report at 51 n 28). The Temporary Commission continued, "[o]n the other hand, it might be contended that the 1966 amendment . . . entitling qualified voters to vote 'at every election for all officers elected by the people and upon all questions submitted to vote of the people,' was intended to give the Legislature unrestricted discretion over absentee voting" but added that "this interpretation, however, makes Article II, section 2 superfluous" (id. [emphasis added]; but see majority op at 
65-66 [omitting the italicized language]). So it would, and because of that, as the Temporary State Commission implied, this latter view should be rejected.
The majority challenges the former interpretation as improperly transferring the prohibition on absentee voting from section 1 to section 2 when section 2 was instead initially crafted "to broaden voter participation" (majority op at 
70; 229 AD3d at 91-92). This on its surface is the strongest argument for my colleagues' position. But the two possible interpretations of the effect of the 1966 amendment make clear that the majority's conclusion as to section 2's validity as a limit post-1966 is wrong.
There are two choices when it comes to the effect of the 1966 amendment. The majority concludes that the legislature proposed an amendment that would remove a nearly 150-year-old limitation on its own authority, without any notice to the{**43 NY3d at 109} people voting on that amendment and without any record of considering the effect. In doing so, either intentionally or accidentally, they rendered section 2 superfluous, even though the legislature and the people had spent considerable time and resources amending that provision a mere three years before. The second choice would have the legislature and the people assume that section 2, now by negative implication, continued the same limitation as before by marking the two exclusive categories—in keeping with the Constitution's role as providing limits on the legislature's otherwise plenary power. This outcome is consistent with the formal opinion of the Attorney General at the time that "the proposed [1966] amendment, if adopted, will have no effect upon the other provisions of the Constitution" (1966 Senate Journal, vol II, at 1936-1937; NY Const, art XIX, § 1). The Attorney General could not have concluded that rendering section 2 superfluous would leave it unaffected by the amendment. Before and after 1966, section 2 provided the exclusive categories qualifying for absentee voting, consistent with both the 1966 Attorney General opinion and the plain meaning of the existing text as discussed in section II above.
In support of its assertion that the legislative and executive branches have "more often" acted as though "no constitutional amendment was necessary to allow certain groups to vote without being present at the polls" (majority op at 
59), the majority relies solely on the example of statutes passed since the 1966 amendment identifying distinct groups of voters authorized to vote by absentee ballot (id. at 
66-68). In fact, each of these statutes fit within the confines of article II, § 2. In 1982, the legislature permitted election workers assigned to work "at a polling place other than the one at which he or she is registered to vote" who "will be unable to appear at the polling place" because their duties "require [them] to be elsewhere" to vote by special ballot (Election Law § 11-302); in 1996, permitted victims of domestic violence who affirm that they have "left [their] residence because of such violence" and want to cast a special ballot "because of the threat of physical or emotional harm" to do so (Election Law § 11-306 [1] [b], [c]); in 2009, extended absentee voting to those "unable to appear personally at the polling place" because of "duties related to the primary [*27]care of one or more individuals who are ill or physically disabled" (Election Law § 8-400 [1] [b]) and in 2016, permitted emergency responders who file a written statement that they{**43 NY3d at 110} will be "unable to appear at the polling place . . . because his or her duties as an emergency responder require such voter to be elsewhere" to cast a special ballot (Election Law § 11-308 [2]). The majority insists that article II, section 2's language authorizing the legislature to provide absentee ballots for persons "unable to appear . . . because of illness or physical disability" "cannot be the legislature's source of authority to permit election workers, first responders, victims of domestic violence, or caretakers of ill or physically disabled persons to vote by some means other than in person at the polls" (majority op at 
67). But each of these statutory changes provided voting opportunities and procedures for those either "unable to appear because of illness" or who "may be absent" within the meaning of, and consistent with, section 2—authorization for the emergency responder, election worker, and domestic violence victim to vote absentee hinges on the voter's attestation that they will be absent from their registered residence, one of the two categories of voters for whom article II, § 2 authorizes the legislature to "provide a manner in which" they may vote absentee. For that reason, no legislative history is needed to "shed light on the question of why the legislature concluded no constitutional amendment was required" (majority op at 
66)—because article II, section 2 permits the legislature to extend absentee voting to those who may be absent or who are ill or disabled, and these groups of absentee voters fit within these categories. The "absent from" or "unable to appear because of illness or disability" provisions of section 2 cover all categories of absentee voting authorized since 1966.
Indeed, expanding absentee voting to new categories of voters within the confines of article II, § 2's limitations was the approach taken by the legislature in enacting, and the Attorney General in defending, a 2020 absentee voter law passed amid the outbreak of the coronavirus pandemic. At that time, the legislature amended Election Law § 8-400, explaining that the statutory language "because of illness" also included "instances where a voter is unable to appear personally . . . because there is a risk of contracting or spreading a disease that may cause illness to the voter or to other members of the public" (L 2020, ch 139, § 1). When this legislation was challenged in court, the Attorney General stressed that the statute complied with the limitations of section 2, representing to the courts that while the "express requirement [that voters do so in person] no longer exists[, . . . ] the Constitution has generally been regarded {**43 NY3d at 111}as continuing to retain the requirement implicitly" (see brief for Attorney General in Cavalier v Warren County Bd. of Elections, 210 AD3d 1131 [3d Dept 2022] at 4), but the exclusive categories of section 2 could be stretched far enough to cover the challenged legislation.[FN4] The same elastic interpretation of section 2 authorizes the various post-1966 absentee voter statutes (see id. at 32 [representing that the legislature had acted on the "more capacious understanding of the term 'illness' " in passing the 2009 legislation related to caregivers]). Any suggestion on the majority's part that article II, § 2's reference to illness or physical disability cannot be the source of the "caretaker" statute (majority op at 
67-68) ignores the decade-long understanding "that constitutional authorization for absentee voting 'because of illness' does not require illness personally and presently afflicting the qualified voter" (brief for Attorney General in Cavalier at 32).
Over this long course of constitutional history, an enduring feature of both the constitutional language, and legislative action in accordance with that language, has been an understanding of the limits on the legislature's authority to provide for absentee voting. The majority would rattle this 150-year-old interpretation of the law to excuse the legislature's disregard of the people's decision to reject an amendment to abolish the restraint. The effort is necessary given that the recent action by the legislature in proposing the amendment and rejecting the outcome makes clear not only the limitation on its authority but the violation that took place here.
IV.
"The right to amend is a defining part of state constitutions" (Jessica Bulman-Pozen & Miriam Seifter, The Right to Amend State Constitutions, 133 Yale LJ Forum 191, 226 [2023]). Put another way, "[c]onstitutions tell us who is in charge [but a]mendments remind officeholders it is not them" (Jeffrey S. Sutton et al., State Constitutional Law: The Modern Experience 1027 [4th ed 2023]). When we consider the history of an amendment, we must therefore look not only to the legislative{**43 NY3d at 112} history behind the drafting of the proposal, but to the understanding of the people in adopting—or rejecting—that proposal.
[*28]
Knowing that such examination would lead to an unfavorable result given the clarity of the materials submitted to voters before they rejected the 2021 proposed amendment, defendants now seek to avoid consideration of the voters' intent, suggesting that precedent from this Court requires us to disregard the voters' understanding of the proposal put before them. While this Court has abandoned the "intelligent, careful voter" approach (Golden v Koch, 49 NY2d 690, 694 [1980]), we have always maintained the importance of the role of the people in the process of amending the Constitution.[FN5] The relevance of the people's voice can be understood through our standard approach to constitutional interpretation (see Golden, 49 NY2d at 694; see also Matter of King, 81 NY2d at 253; see also Robert F. Williams, The Brennan Lecture: Interpreting State Constitutions as Unique Legal Documents, 27 Okla City Univ L Rev 189, 196 [2002] ["Often state courts will examine . . . evidence of the voters' intent derived from official ballot pamphlets and other materials presented to voters prior to the referendum"]; G. Alan Tarr, Understanding State Constitutions, 65 Temple L Rev 1169, 1186 [1992] ["(T)he more recent the constitutional provision, the more likely that there is an extensive documentary record . . . (such as) voters' pamphlets . . . bearing on its meaning"]). We have never abandoned the requirement that we "look for the intention of the People" in construing the language of the Constitution (see Hoffman, 41 NY3d at 359 [citation and internal quotation marks omitted]).
Examining what the people were told, and what they intended, is all the more important in our state given the limited avenues available for participation by the people in the amendment process. New York has only two ways to amend the Constitution—by legislative proposal or by convention (see NY Const art XIX). Ours is not one of the 18 states that "permit initiatives as a way for the people to directly amend their constitutions" (Jeffrey S. Sutton, Who Decides? States as Laboratories of Constitutional Experimentation 345 [2002]; see also Jerald A. Sharum, Note,{**43 NY3d at 113} A Brief History of the Mechanisms of Constitutional Change in New York and the Future Prospects for the Adoption of the Initiative Power, 70 Albany L Rev 1055, 1080 [2007] ["The power of the people to initiate constitutional amendments has never been established in New York"]). As there has been no constitutional convention called in New York since 1967, legislative proposals put to the people for approval have become the sole avenue for amendment in the State, and it is an avenue often taken—from 1967 through 1996, the legislature proposed 4,437 constitutional amendments (see New York State Bar Association, Report of the Committee on the New York State Constitution [Jan. 2024]). As a result, the legislature has become the gatekeeper to constitutional reform (see Sharum, 70 Albany L Rev at 1082 ["(T)he initiative (power) provides a relief mechanism outside the legislative sphere to achieve constitutional change without requiring direct support in the legislature"). Or, along the same lines, the legislature acts as the people's agent in proposing amendments. With that role in mind, I turn to the failed amendment of 2021.
In 2019, the legislature proposed an amendment to article II, § 2, to remove the limitation on the legislature's authority to provide for absentee voting, explaining that it was necessary because "[c]urrently, the New York State Constitution only allows absentee voting if a person expects to be absent from the county in which they live, or the City of New York, or because of illness [ ]or physical disability" (Senate Introducer's Mem in Support, 2019 NY Senate-Assembly Concurrent Resolution S1049, A778). As required by article XIX of the Constitution, after the proposal was agreed upon "by a majority of the members elected to each of the two houses," it was then "referred to the next regular legislative session convening after the succeeding general election" (NY Const, art XIX, § 1) and was agreed upon by another group of legislators upon the premise that "the New York State Constitution allows absentee voting in extraordinarily narrow circumstances" (Senate Introducer's Mem in Support, 2021 NY Senate-Assembly Concurrent Resolution S360, A4431). That is, two separate legislatures approved the submission of the amendment to the people demonstrating that "the legislature itself recognized that the Constitution did not permit it to proceed" (Matter of Harkenrider v Hochul, 38 NY3d 494, 516-517 [2022] [discussing impact of voters' rejection of a different proposed amendment also on the 2021 ballot]).
Voters were then told that a restriction existed within the Constitution, and that the proposed amendment would eliminate{**43 NY3d at 114} it (see Ballot Proposal 4, 2021 Statewide Ballot Proposal: Abstract ["The purpose of this proposal is to eliminate the requirement that a voter provide a reason for voting by absentee ballot . . . by deleting the [*29]requirement currently in the Constitution that restricts absentee voting to people under one of two specific circumstances"]). The ballot language itself read: "The proposed amendment would delete from the current provision on absentee ballots the requirement that an absentee voter must be unable to appear at the polls by reason of absence from the county or illness or physical disability. Shall the proposed amendment be approved?" (2021 Statewide Ballot Proposals). The people's answer was no.[FN6]
Despite the 55 to 45 percent margin of the vote against the amendment, and with the knowledge that the people were told that such an amendment was necessary to authorize further expansion of the absentee ballot, the legislature passed the Early Mail Voter Act. The 2023 legislation provides that any registered voter may apply "to vote early by mail," and requires the board of elections to mail an early mail ballot to any applicant, so long as their application is received within the time limit set out in the statute (Election Law § 8-700). The application requests basic personal information—full name, date of birth, and address (Election Law § 8-700 [3]). No reason need be given for the decision to vote by mail; no showing of potential absence, inability to appear, illness, risk of illness, physical disability, care for individuals with physical disability, or anything of the sort need be provided.
The legislature's action effectively reads the people's power to amend—or refuse to amend—out of the Constitution, and by allowing this to stand the majority "usurp[s] the voters' prerogative to maintain or alter" constitutional provisions by permitting the legislature to do so (White, 38 NY3d at 252 [Wilson, J., dissenting] [emphasis added] ["We can only hope the decision does not crack the foundational principle we have thus far followed: that the three branches of government limit each other in important ways to protect the rights of the people of our state" (id.)]).
The constitutional text is clear; the legislature's power to authorize absentee voting is limited by article II, § 2. This restriction, {**43 NY3d at 115}plain on the face of the document, is reinforced by 200 years of constitutional history. Most recently, in 2021, voters were asked—in effect by two separate legislatures—to approve a change that would have permitted the legislature to recast the balance between universal suffrage and fraud prevention; they declined to do so. The legislature's response—essentially "we never needed you anyway"—breached the trust placed in the legislature to act for the people in the amendment process. The majority gets by this "troubling" "recent sequence of events" by sowing unfounded doubts about the established interpretation of the Constitution as limiting the legislature's authority to make rules governing absentee ballots (majority op at 
74 ["Had there been a clear, unequivocal, and persistent understanding by our coordinate branches that the Constitution required in-person voting, this would be a more difficult case"]). We can expect that whatever criticism of the legislature's actions the majority musters will have all the effect of a strongly worded letter to the editor of a local newspaper on an issue of good government. The reader applauds the sentiment but laments being powerless to impose a remedy. But this Court has both the power and the duty to remedy what happened here, and our failure to do so diminishes us and nullifies the will of the people. I dissent.
Judges Singas, Cannataro and Halligan concur. Judge Rivera concurs in result in an opinion, in which Judge Troutman concurs. Judge Garcia dissents in an opinion.
Order affirmed, without costs.

Footnotes

Footnote 1:Those procedures are essentially the same ones already in place for absentee voting (see Election Law § 8-400 et seq.) except that there is no requirement that the voter fit into the absentee categories described in section 8-400 (1).

Footnote 2:In 2021, the bill sponsors referenced the use of vote-by-mail that was passed in response to the COVID-19 pandemic (see 2021 NY Senate-Assembly Concurrent Resolution S360, A4431).

Footnote 3:The Democratic Congressional Campaign Committee, several voters, and New York federal and state elected officials intervened in defense of the constitutionality of the Act; our references to "defendants" include them. Board of Elections Co-Chair Peter S. Kosinski was named as a defendant in this action, however, throughout this litigation he has always supported the plaintiffs' arguments; although he is nominally a defendant, our references to plaintiffs herein include him.

Footnote 4:The common usage of "voting at an election" can be seen in reference to political elections (see e.g. US Const, Amend XIV, § 2 ["when the right to vote at any election for the choice of electors for President and Vice President of the United States"]; Election Law § 5-102 [1] ["No person shall be qualified to register for and vote at any election unless he is a citizen of the United States"]; 52 USC § 10101 [a] [1] ["All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State"]; Dubuclet v Louisiana, 103 US 550, 552 [1881] ["The laws of Louisiana, it is conceded, gave colored men the right to vote at all elections"]), but is not limited to that subject matter. To "vote at an election" is also routinely used to describe voting of all sorts, without any suggestion of a constitutional limitation on the place or manner by which voting must take place (see e.g. Anderson v Abbott, 321 US 349, 375 n 3 [1944] ["Any such holding company affiliate may make application to the Federal Reserve Board for a voting permit entitling it to cast one vote at all elections of directors" (quoting section 19 of the Banking Act of 1933)]; Matter of Mutual Fire Ins. Co., 164 NY 10, 16 [1900] ["holders of cash policies were persons insured in the company . . . and as such it appears to us that they were entitled to vote at any election of the company"]).

Footnote 5:One delegate stated that "[t]o me, and the majority of the committee, it appeared the only reasonable scheme that those who are to be affected by the acts of the government, should be annually entitled to vote for those who administer it" (1821 Convention Proceedings at 97). Another delegate explained the amendment as designed "to prevent contiguous counties from pouring their population into another for a special purpose" (id. at 111).

Footnote 6:Governor Seymour was a Democrat and Democrats at that time opposed letting soldiers vote by mail because they thought the soldier vote would support the Republicans (Mr. Lincoln and New York, Soldier's Votes, available at https://www.mrlincolnandnewyork.org/new-york-politics/soldiers-votes [last accessed Aug. 20, 2024]; Jonathan W. White, Canvassing the Troops: The Federal Government and the Soldiers' Right to Vote, 50 Civil War History 291 [2004]). Although President Lincoln was eventually reelected by a comfortable margin, as late as the end of August 1864, it appeared that he would lose (see generally David Herbert Donald, Lincoln at 528-530 [1996]; id. at 529 [on August 22, 1864, Henry J. Raymond, chairman of the National Union Executive Committee, warned Lincoln that he would lose New York by 50,000 votes]; Timothy P. Townsend, Lincoln, Grant and the 1864 Election, available at https://home.nps.gov/liho/learn/historyculture/lincolngrant.htm [last accessed Aug. 20, 2024]; see also Library of Congress, Abraham Lincoln papers: Series 3. General Correspondence. 1837-1987: Abraham Lincoln, Tuesday, August 23, 1864 
[Memorandum on Probable Failure of Reelection; endorsed by members of cabinet], available at http://hdl.loc.gov/loc.mss/ms000001.mss30189a.4359700 [last accessed Aug. 20, 2024]). Thus, it is not clear how much Governor Seymour's view (and veto) was based on an analysis of the Constitution, and how much was based on political motivations. Likewise, the legislature's resolutions and the voters' adoption of the amendment permitting soldiers to vote may have reflected a practical work-around of the Governor's veto, not an acceptance of his interpretation of the Constitution.

Footnote 7:Our dissenting colleague observes that in State ex rel. Chandler v Main, counsel "appears" to have argued that the phrase in New York's Constitution—"vote in the town or ward where he actually resides, and not elsewhere"—was materially different from that in Wisconsin's Constitution—"provided, that no person shall vote for county officers out of the county in which he resides" (16 Wis at 412, 415; dissenting op at 
104). Those provisions have precisely the same meaning and, in any event, Wisconsin's Supreme Court made no mention of any such difference in reaching its decision that the above phrase in Wisconsin's Constitution was not intended "to prohibit any voter from ever being allowed to cast his ballot outside of the county in which he resided . . . [but rather] only to prohibit any voter from voting for the county officers of a county in which he did not reside" (16 Wis at 415). As discussed supra at 
60-61, the legislative history of the Election District Provision supports that same view.

Footnote 8:Our dissenting colleague quotes dicta from both Lardner and Matter of Gross v Albany County Bd. of Elections (3 NY3d 251 [2004]) as if those snippets were holdings (see dissenting op at 
100-101). They are not. Lardner's holding is that the legislature may delegate to localities the power to locate polling places outside of the pertinent election district (see 155 NY at 496-497). Our holding in Matter of Gross is that "absentee ballots collected in violation of both a federal court order and article 8 of the Election Law are invalid" (3 NY3d at 255). Our holding did not depend on any interpretation of our Constitution.

Footnote 9:Plaintiffs and our dissenting colleague rely heavily on the Election District Provision's "and not elsewhere" language to conclude there was an in-person requirement (see dissenting op at 
100-101, 103, 103-104). Yet that language was eliminated by vote of the people. To accept our dissenting colleague's theory that we must entirely ignore history and look only to what remains in the Constitution (section 2, the grant of authority for absentee voting), would mean that even if the 1966 referendum had publicly been explained as designed to authorize mail-in voting, because section 2 remained, we would nevertheless have to hold that mail-in voting is prohibited. To the contrary, in determining whether section 2 standing alone is sufficient to overcome the strong presumption of constitutionality we must afford to the Act, the constitutional history of that provision is clearly relevant.

Footnote 10:Notably, Co-Chair Kosinski, who has always supported plaintiffs' position that the Constitution requires in-person voting, forcefully contends that the Election District Provision is not the source of any in-person voting requirement.

Footnote 11:Contrary to the dissent's understanding of expressio unius (see dissenting op at 
97-98), it is "not . . . an ironbound rule of law excluding in all cases from the operation of a statute those things which are not enumerated therein. It is merely an aid to be utilized in ascertaining the meaning of a statute when its language is ambiguous" (McKinney's Cons Laws of NY, Book 1, Statutes § 240, Comment; see Brennan-Centrella v Ritz-Craft Corp. of Pa., 942 F3d 106, 111 [2d Cir 2019] [the maxim is "only an aid to statutory construction, not a rule of law, making the principle an uncertain guide to interpretation" (internal quotation marks and citation omitted)]; see also Westnau Land Corp. v United States Small Bus. Admin., 1 F3d 112, 116 [2d Cir 1993] ["The controlling consideration is legislative intent . . . Since not every silence is pregnant, expressio unius is an uncertain guide to interpretation" (internal quotation marks, brackets and citations omitted)]). Additionally, mechanically applying the maxim to interpret the Constitution in a vacuum, as the dissent would have us do (see dissenting op at 
98-99), would not aid in its purpose of divining the legislative intent (see Price v Price, 69 NY2d 8, 16 n 3 [1986] ["The maxim 'is merely an aid to be utilized in ascertaining the meaning of a statute when its language is ambiguous, and should be applied to accomplish the legislative intention, not to defeat it' " (quoting McKinney's Cons Laws of NY, Book 1, Statutes § 240, Comment)]; United States v Barnes, 222 US 513, 519 [1912] [expressio unius "expresses a rule of construction, not of substantive law, and serves only as an aid in discovering the legislative intent when that is not otherwise manifest"]).

Footnote 12:The legislative and constitutional history materials describe the 1966 amendment as one aiming to reduce residency requirements to three months (see Abstract of Proposed Amendment No. 6 [1966]; 1967 Rep of Temp St Commn on Constitutional Convention, Rep No. 4, The Right to Vote at 10, 29, 48-51) as part of an effort to increase voter participation (see 1965 NY Senate-Assembly Concurrent Resolution S5519, A923 [proposing amendment to NY Const, art II, § 1]; Rep of Joint Legis Comm to Make a Study of the Election Law and Related Statutes, 1966 NY Legis Doc No. 30 at 11 [acknowledging objective to "(l)iberaliz(e) . . . laws pertaining to registration and voting to achieve an increase in voter participation"]).

Footnote 13:Several delegates reiterated that the amendment was intended to ensure that the legislature would be unfettered to adapt even then-unknown methods of voting (see id. at 88-89 ["are we ready at this stage, in the nineteenth century, to say that it is impossible . . . that any machine may be devised for voting, or any other method may be devised than voting 'by ballot'? . . . The object of this amendment . . . is to empower the Legislature to provide for elections by some other method than 'by ballot,' in case such other method be sufficiently approved to warrant its introduction, and that only. . . . This amendment opens the door to all improvements . . . . Some improved methods may be devised which will obviate all the difficulties which have been suggested as incident to the Myers machine, and will supersede the cumbersome and expensive method of voting under the present electoral law"]; id. at 87 [the Constitution should not contain "a prohibition against further advance in the making or in the use of devices having reference to such an important matter as elections"]). Their view carried the day.

Footnote 14:The bulk of the dissent's argument is that for a long time, the other branches of government have acted as if the Constitution required an amendment for voting that was not in-person. Putting aside our disagreement that the general understanding of the text has been "clear" for the last 200 years (see dissenting op at 
95, 103, 114-115), our dissenting colleague does not dispute that the Court was never asked to decide that question; nor does he dispute that it is our unique role to do so.

Footnote 15:Compare concurring op at 
84 ("since 1966, the Constitution has lacked any express language suggesting an in-person voting requirement"), with dissenting op at 
97 ("A review of the plain text of the provisions at issue here establishes that the people intended the Constitution to limit the legislature's authority to make laws governing absentee voting, and that the Early Mail Voter Act, whatever its merits or flaws as policy, goes behind those limits and is therefore unconstitutional").

Footnote 1:It was not until 1917 that women secured the right to vote in New York State (see 1894 NY Const, art II, § 1, as amended Nov. 6, 1917). For purposes of historical accuracy, I quote, without modification, the original male centric language used during the years prior to women's suffrage.

Footnote 2:Charles Z. Lincoln was a delegate to the Constitutional Convention of 1894 and, from 1895 to 1900, served as Chair of the Statutory Revision Commission and legal advisor to several New York governors. Lincoln's five-volume The Constitutional History of New York is a "fundamental resource for [New York State] constitutional history from the beginning of the colonial period to 1905" (New York State Library, New York State Constitutional Conventions and Constitutional History [Sept. 19, 2022], available at https://www.nysl.nysed.gov/scandocs/nyconstitution.htm [last accessed Aug. 20, 2024]).

Footnote 3:Following the participation trend in off-cycle years, in the 2021 election 25.7% of registered voters cast a ballot—a total of 3,441,110 votes. A smaller number of those votes were validly cast and counted on the ballot proposal, rejecting it by approximately 306,000 votes: 1,677,580 voted against and 1,370,897 voted in favor (see New York State Board of Elections, Enrollment By County, Voters Registered by County as of 11/1/2021, available at https://elections.ny.gov/enrollment-county?f %5B0%5D= filter_ term%3A256 [last accessed Aug. 20, 2024]; New York State Board of Elections, Past Election Results, Authorizing No-Excuse Absentee Ballot Voting, available at https://results.elections.ny.gov/contest/590 [last accessed Aug. 20, 2024]).

Footnote 4:Contrary to the dissent, this reference suggests no judicial " 'political maxims' " or " 'line of policy' " (dissenting op at 
97, quoting People ex rel. Wood v Draper, 15 NY 532, 546 [1857]), but merely acknowledges the legislature's statement of policy.

Footnote 5:The Act provides that "any early mail ballot received by the [BOE] by mail that does not bear or display a dated postmark shall be presumed to have been timely mailed or delivered if such ballot bears a time stamp of the receiving [BOE] indicating receipt by such board on the day after the election" (Election Law § 8-710 [1]).

Footnote 6:The tracking system must indicate whether the BOE: (1) received and approved or rejected the voter's application to vote early by mail; (2) sent the voter a ballot and when; and (3) determined that the voter could cure a defective "ballot envelope" (Election Law § 8-712 [3] [a]-[c], [f]).

Footnote 7:This was the understanding of the senators who passed the 1863 bill giving qualified servicemembers the option of giving another in-district voter permission "to cast for [the service member] [their] vote or ballot, in the same manner as other votes are cast, for all officers for which [they] would have the right to vote if [they] were in person present at such election" (1863 NY Senate Bill 300, § 2).

Footnote 8:Given the broad authority under article II, § 7 which allows the legislature to permit voting without a paper ballot—provided that secrecy is maintained—the Court need not decide whether mail-in ballots are "ballots" within the meaning of the Constitution.

Footnote 9:The dissent cites to an Appellate Division decision as an example of a precedent applying expressio unius est exclusio alterius to construe the Constitution (see dissenting op at 
98, citing Silver v Pataki, 3 AD3d 101, 107 [1st Dept 2003]). The Court affirmed the Appellate Division, but not on the basis of expressio unius est exclusio alterius (see generally Pataki v New York State Assembly, 4 NY3d 75 [2004]).

Footnote 10:Notably, the legislature has expanded by statute the class of persons who may vote by mail—for example, military voters (see Election Law § 10-112; L 1976, ch 233, § 1). Those persons would, under plaintiffs' and the dissent's view, be considered absentee voters (dissenting op at 
109-110). Thus, it appears that, even before passage of the Act, the legislature assumed it had the authority to statutorily expand voting by mail.

Footnote 11:I agree with the dissent's general assertion that "[c]onsideration of the relevant constitutional history is not 'improper' " and that "it is the majority's effort to recast our history that is unsound" (dissenting op at 
102, quoting majority op at 74). As for the majority's notion that the dissent and I view "the text [a]s clear in diametrically opposed ways" (majority op at 
74 & n 15), this misunderstands our respective positions. The dissent and I agree on how to read article I, § 1 and that, after the 1966 amendment to section 1, there is no express in-person voting requirement (see dissenting op at 
107-108).The dissent and I disagree, not with any express language, but on whether mail-in voting is absentee voting and whether section 2 is subject to the expressio unius est exclusio alterius canon. As to this final point, the majority and I agree.

Footnote 12:The dissenters in Golden parted ways with the majority on all but this point and "heartedly endorse[d] abandonment of the 'intelligent, careful voter' rule" (49 NY2d at 700 [Meyer, J., dissenting]).

Footnote 13:Indeed, the legislature has done so. For example, instead of having to apply to vote absentee in each election, hospitalized veterans may register as such and "need not thereafter make application for an absentee ballot" (Election Law § 8-404 [1] [a]). Instead, 60 days before each election, the Board of Elections must furnish hospitals with lists of eligible veteran voters, which the hospital must, within 15 days, cross-reference with its directory of patients or residents (id. § 8-404 [1] [a]-[b]). The Board will then automatically send a hospitalized veteran an absentee ballot (id. § 8-404 [1] [a]). As another example, registered voters residing in certain nursing homes, residential health care facilities, and facilities operated by either the Department of Mental Hygiene or Veterans' Administration of the United States vote absentee by a special procedure under which the local Board appoints "bi-partisan boards of inspectors" who may deliver absentee ballots to residents personally—including at their bedsides—and, if the voter is unable to mark their ballot, may be assisted by either two inspectors or another person of their choosing, unless the voter "is unable to mark the ballot and unable to communicate how [they] wish[ ] such ballot marked" (id. § 8-407).

Footnote 14:The majority presents as another example of a historical remnant the 1864 constitutional provision permitting soldiers and sailors to vote absentee (majority op at 
71). According to the majority that provision became "superfluous" after the 1919 passage of what was then section 1-a of article II (id.). But a close comparison of these two versions of this provision fails to support the majority's claim. First, the 1864 amendment was mandatory in that it required the legislature to ensure "no elector in the actual military service of the United States, in the Army or Navy thereof, shall be deprived of [their] vote by reason of [their] absence from the state" (2 Charles Z. Lincoln, The Constitutional History of New York at 239), whereas the 1919 amendment was permissive in that it ultimately authorized—but did not require—the legislature to establish absentee voting for servicemembers (see 1894 NY Const, art II, § 1-a, as amended 1929). Second, section 1-a's reference to soldiers and sailors was a deliberate addition, not a superfluous remnant. Article II, § 1-a originally authorized the legislature to establish absentee voting for "qualified voters" who were "unavoidably absent from the state or county of their residence because their duties, occupation or business require[d] them to be elsewhere within the United States" (id., as added Nov. 4, 1919). In 1923, however, that provision was amended to refer expressly to "inmates of a soldiers' and sailors' home" (1894 NY Const, art II, § 1-a, as amended 1923). The new text distinguished this group from those whose "duties, occupation or business require[d] them to be elsewhere within the United States" with a disjunctive "or" (id., as amended 1923), thus accounting for the unique obstacles faced by incapacitated soldiers and sailors (see majority op at 
71-72).

Footnote 1:Nor does the canon against superfluity permit provisions to be recast as mere "historical remnant[s]" to avoid being labeled as "superfluous" (majority op at 
71) because "[a]ll parts of the constitutional provision . . . must be harmonized with each other" (Matter of Hoffmann v New York State Ind. Redistricting Commn., 41 NY3d 341, 359 [2023] [citations and internal quotation marks omitted]).

Footnote 2:The majority takes its examination of the "political motivations" of a sitting governor only so far (majority op at 
62 n 6 [questioning Governor Seymour's motivation in vetoing the legislation, given that he was a Democrat and that party generally opposed letting soldiers vote by mail as they were likely to vote Republican]).

Footnote 3:Of course, lack of secrecy continued to be a major concern in the absentee voting process (see Matter of Gross, 3 NY3d at 255 [noting that safeguards were adopted in certain absentee voting laws "in recognition of the fact that absentee ballots are cast without the secrecy and other protections afforded at the polling place"]). The inability to preserve secrecy in the process reinforces the conclusion that absentee balloting is not available to the legislature as a "method" by which elections could be conducted.

Footnote 4:The Attorney General now not only disavows the existence of any constitutional limitation but denies that what she described previously as a "generally" held view ever garnered a "consensus." It is difficult to reconcile the Attorney General's latest position with the standard definition of "consensus" as "[a] general agreement" (Black's Law Dictionary 382 [12th ed 2024]).

Footnote 5:Despite the suggestion in the concurrence, we have never weighed the people's intent by voter turnout (see concurring op at 
81 n 3).

Footnote 6:This was a proposal for removing any bar on the legislature's authority to institute universal absentee voting—not a suggested mechanism for absentee voting with which voters may have had specific disagreements. It was a simple yes or no question.